[No. 73155-1.    En Banc.]

Argued November 30, 2006.    Decided September 27, 2007.

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT LEE YATES, JR., *Appellant*.

716

718

720

722

*Thomas M. Kummerow*, *Gregory C. Link*, and *Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Gerald A. Horne*, *Prosecuting Attorney*, and *Kathleen Proctor* and *Donna Masumoto*, *Deputies*, for respondent.

¶1 Owens, J. — At trial in 2002, Robert Lee Yates Jr. was convicted of the 1997 aggravated first degree murder of Melinda L. Mercer and the 1998 aggravated first degree murder of Connie L. Ellis. At the special sentencing hear-

ing, the jury found insufficient mitigating circumstances to warrant leniency. Yates was sentenced to death. He appeals his convictions and sentence. Finding no reversible error in the guilt or penalty phases, we *affirm* the judgment and sentence of the trial court.

## FACTS AND PROCEDURAL HISTORY[1]

¶2 The Pierce County Murders. Melinda Mercer turned to prostitution in November 1997 to support her heroin addiction. She was last seen alive on the night of December 6, 1997, leaving a Seattle tavern. According to the testimony of a friend, Mercer left the tavern to go to Aurora Avenue to make money for a heroin buy. On the following morning, Mercer's nude body was found in some blackberry bushes in a vacant lot in Tacoma, a lot used as a dump site for garbage. Some of her clothing had been thrown on top of her, but other items were never recovered. An autopsy revealed that she had been shot three times in the back left side of the head. Only one of the three bullets penetrated her brain, but it did so without affecting the areas that control consciousness and motor response. Found nearby was a .25 caliber shell casing. Bloodstains on her blouse indicated that she had been clothed and upright when shot in the head. After shooting her, the killer encased her head in four plastic grocery bags. The two outer bags contained very little blood, but blood had pooled inside the two inner bags. Mercer's nostrils and upper lip were visible through small tears in the two inner bags, which had been partially drawn into Mercer's mouth; the holes suggested that Mercer was alive when the bags were tied over her head and that she had used her teeth to create the holes. Although Mercer could have died solely from the gunshot wounds, the oxygen deprivation would have hastened her death.

¶3 Connie Ellis likewise worked as a prostitute to support a heroin addiction. Ellis had reentered a methadone

[1] The facts relevant to particular issues will be set forth in more detail in the analysis section below.

treatment program on September 8, 1998, and she was last seen alive on September 17, 1998, when she received a dose of methadone at the clinic (a urinalysis taken at that time revealed that she was again using heroin). On October 13, 1998, approximately 11 months after the discovery of Mercer's body, a search and rescue dog that was engaged in an unrelated search in Pierce County discovered Ellis's decomposed body 10 feet down an embankment in a greenbelt used as a dump site. The degree of decomposition suggested that Ellis had been killed a month prior, not long after her September 17 visit to the methadone clinic. Ellis's body was clothed in jeans, a blouse, and socks, but lacked any undergarments. Ellis died of a single gunshot wound to the left side of her head. The wound was consistent with a .25 caliber bullet. Her head was encased in three plastic grocery bags.

¶4 The Spokane County Murders. On the day Ellis's body was discovered, the Spokane County Sheriff's Department learned of the Pierce County case. In a phone call to one of the Tacoma detectives investigating the Ellis murder, a Spokane detective asked, " 'Will you just tell me one thing? Does she have plastic bags on her head?' " 52 Verbatim Report of Proceedings (VRP) at 4855. Detectives from Tacoma and Spokane shared information gathered on the 2 Pierce County murders and 10 unsolved murders committed in Spokane County between 1996 and 1998. As did Mercer and Ellis, the 10 Spokane victims had a history of drug abuse and worked in prostitution (all were last seen in the East Sprague Street corridor in Spokane, an area known for prostitution).[2] Again like Mercer and Ellis, the Spokane victims had been shot in the head with a small

---

[2] The 10 Spokane victims (with the dates their bodies were found) were Shannon Zielinski (June 14, 1996), Jennifer Joseph (Aug. 26, 1997), Heather Hernandez (Aug. 26, 1997), Darla Scott (Jan. 5, 1997), Shawn L. Johnson (Dec. 18, 1997), Laurie Wason (Dec. 8, 1997), Sunny Oster (Feb. 8, 1998), Linda Maybin (Apr. 1, 1998), Michelyn J. Derning (July 7, 1998), and Melody Murfin (who disappeared in 1998 but whose body was not recovered until 2000 after excavation at Yates's house). *See* Br. of Resp't at 21.

caliber handgun.[3] Moreover, just as Mercer's and Ellis's heads had been encased in plastic bags, two or three plastic bags had been tied over the heads of five of the Spokane victims.[4] Similarly, plastic bags were found in the grave with one victim and near the body of another,[5] and a towel was found on or near the first two victims.

¶5 On April 18, 2000, a year and a half after the discovery of Ellis's body, the Spokane police arrested Yates. The police first contacted him in July 1998, after the body of Michelyn Derning was discovered on July 7, 1998, a block north of Pantrol, a manufacturing company where Yates had worked since moving to Spokane in April 1996 after being released from the army. Yates gave the officer his name, date of birth, and address. A second contact occurred on November 9, 1998, when a police officer saw Yates pick up Jennifer Robinson in the East Sprague Street area. Yates told Robinson to say that he was one of her father's friends, and Robinson complied. When asked for identification, Yates gave the officer his driver's license. The officer ultimately let them move on, and Yates dropped Robinson off a few blocks away. Following the Pantrol interview and the Robinson incident, the police learned that Yates had once owned a white Corvette, a type of car that witnesses had reported seeing in relation to the disappearance of two of the earliest victims, Jennifer Joseph and Heather Hernandez. Late in 1999, a Spokane detective interviewed Yates, who claimed he never patronized Spokane prostitutes and owned no handguns. He admitted that he had previously owned a white Corvette and had sold it to a friend, Rita Jones. The police located Yates's white Corvette in January 2000 and discovered under the front passenger seat the white mother-of-pearl button missing from Joseph's blouse. Bloodstains found in the Corvette matched Joseph's deoxyribonucleic acid (DNA).

---

[3] Joseph was shot with a .22, the remaining nine with a .25.

[4] Johnson, Wason, Oster, Maybin, and Murfin (*see supra* note 2).

[5] Scott and Derning (*see supra* note 2).

¶6 Following Yates's arrest, the police developed additional evidence. On the day after the arrest, Christine Smith, a former prostitute, contacted the police to identify Yates as the person who had picked her up in Spokane in August 1998 and shot and robbed her in the back of his van. In May 2000, officers searched Yates's black Ford van, in the back of which Yates had installed a homemade wooden platform bed covered with carpet. The carpet, padding, and underlying wood tested positive for blood (later identified as that of Ellis and Murfin),[6] and three bullet holes were found, as well as a spent bullet and bullet debris (containing Smith's DNA). From Yates's house, the police took records indicating that he had owned at least three guns, one .22 caliber and two .25 caliber handguns. Forensic analysis later showed that Mercer was killed with the same .25 caliber handgun used in the murders of Spokane victims Johnson, Oster, Wason, and Maybin and that Ellis was killed with a different .25 caliber gun, the same one used to murder Murfin and wound Smith. Other evidence taken from Yates's house established that, at the time Mercer and Ellis were last seen alive, Yates had been in the Tacoma area, fulfilling National Guard duties at nearby Fort Lewis. From Yates's closet, the police took a jacket identified as the one Smith had been wearing on the night Yates assaulted and robbed her, and from Yates's laundry room, they took a canvas coat that bore a stain later identified by DNA analysis as Mercer's blood. Using Yates's hand-drawn map, police excavated an area on the east side of Yates's house, beneath his bedroom window, and recovered Murfin's body. The semen collected by oral, vaginal, and/or anal swabs from Mercer and six Spokane victims (Scott, Johnson, Wason, Oster, Maybin, and Derning) was linked by DNA analysis to Yates, as were hairs found on Mercer and Maybin.

[6] Just as Joseph's blood was found in Yates's white Corvette and Ellis's and Murfin's blood in the Ford van, Zielinski's blood was found on the carpet of Yates's Chevrolet van.

¶7 Yates was ultimately charged in Spokane County Superior Court with 10 counts of first degree murder and 1 count of attempted first degree murder. On October 13, 2000, in exchange for the Spokane County Prosecuting Attorney's agreement not to seek the death penalty, Yates pleaded guilty to the Spokane County crimes, as well as to two counts of first degree murder in Walla Walla County and one in Skagit County. His statement on plea of guilty did no more than acknowledge that he had committed with premeditated intent the murders listed in the amended information, which had provided nothing more than the names and dates of the murders. Yates was sentenced to 408 years in prison.

¶8 Prosecution of the Pierce County Murders. On July 17, 2000, the Pierce County Prosecuting Attorney filed an information charging Yates with the aggravated first degree murders of Mercer and Ellis. On each count, the State alleged three aggravating factors and a firearm enhancement. At the time the information was filed, the State also provided Yates with notice of its consideration of a special sentencing proceeding, inviting Yates to submit mitigation material to the prosecuting attorney. At Yates's arraignment on October 31, 2000, he entered a plea of "not guilty," and the court read the State's notice of consideration of a special sentencing proceeding. The court entered an order extending until January 15, 2001, the State's deadline for filing its notice to seek the death penalty, a notice that the State timely filed on January 12, 2001.

¶9 Opening statements were delivered on August 12, 2002, and the State rested its case-in-chief on September 11, 2002. The defense rested the following day. The jury found Yates guilty on both counts of first degree murder and likewise determined that, with respect to each count, the State had proved beyond a reasonable doubt the existence of all three aggravating circumstances. Additionally, the jury found that Yates committed the murders while armed with a firearm. After hearing the evidence and closing arguments in the special sentencing hearing, the jury

returned a verdict for a death sentence. At sentencing, the court rejected Yates's argument that his death sentence had to be served consecutively to the 408-year sentence imposed in Spokane County. Yates filed a timely notice of appeal.

## ISSUES PRESENTED

### A. *Issues Raised by Defendant*

1. As a result of the Pierce County Prosecuting Attorney's contacts with the Spokane County Prosecuting Attorney during the preliminary plea negotiations in Spokane County, should Pierce County have been barred from seeking the death penalty for the two murders that Yates committed in Pierce County?

2. Did the trial court violate Yates's right to a fair and impartial jury?

3. In jury instruction 20, did the trial court substantially lower the State's burden of proof by improperly defining the aggravating circumstance of RCW 10.95.020(10), commission of the murders as "part of a common scheme or plan"?

4. Did the State offer sufficient evidence to prove the three alleged "aggravating circumstances" beyond a reasonable doubt?

5. Did the second amended information fail to allege all of the elements of the crime of aggravated first degree murder?

6. Did the trial court deny the jury the opportunity to convict Yates of the lesser offense of first degree murder?

7. Did the trial court abuse its discretion regarding expert testimony?

8. Did the trial court abuse its discretion by admitting certain photographic evidence?

9. Did the trial court abuse its discretion by permitting the State to use exhibit 544, a large summary chart of the evidence that the State presented regarding the Spokane County and Pierce County crimes?

10. Did Yates meet his burden of proving that the prosecutor engaged in misconduct and that the misconduct prejudiced Yates's right to a fair trial?

11. Did the trial court err in ordering Yates to serve the sentence imposed for the Pierce County murders concurrently with the sentence imposed for the Spokane County crimes?

B. *Mandatory Death Sentence Review and Related Issues Raised by Defendant*

1. Was there "sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4)"? (RCW 10.95.130(2)(a))

2. Was the sentence of death "brought about through passion or prejudice"? (RCW 10.95.130(2)(c))

3. Was the sentence of death "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"? (RCW 10.95.130(2)(b))

4. Is Washington's death penalty statute unconstitutional?

## ANALYSIS

### A. *Issues Raised by the Defendant*

¶10 1. *Plea Bargaining.* Yates claims that, in light of the Pierce County Prosecuting Attorney's initial involvement in the Spokane County plea-bargaining process, Pierce County should have been barred from seeking the death penalty for the two murders that he committed in Pierce County. Yates contends that Pierce County's decision to seek the death penalty violated the doctrines of equitable estoppel and fundamental fairness.

a. Equitable Estoppel

¶11 On January 23, 2002, Yates filed a motion arguing that Pierce County should be equitably estopped from

seeking the death penalty. The court ordered an evidentiary hearing. Because the parties anticipated that Pierce County Executive John Ladenburg would be testifying about events that had occurred when he was Pierce County's elected prosecutor, the court ordered that the evidentiary hearing be held before a visiting judge. After hearing testimony, Grays Harbor County Superior Court Judge Gordon Godfrey denied Yates's motion and issued findings of fact and conclusions of law. Yates now assigns error to the denial of the motion and, in particular, to the trial court's "ruling that absent a challenge to his plea agreement entered in Spokane County, Mr. Yates could not seek to prevent the State from pursuing the death penalty in this case." Br. of Appellant at 2 (Assignments of Error 2-3). Yates also assigns error to findings of fact 4, 5(a) and (b), 11, and 12. *Id.* at 2-3 (Assignments of Error 4-7).

¶12 Factual Background. At the evidentiary hearing, the court heard testimony from Spokane County Prosecuting Attorney Steven Tucker, former Pierce County Prosecuting Attorney John Ladenburg, and others. The testimony (and the court's unchallenged factual findings) established that Yates was arrested in Spokane County on April 18, 2000, and charged with the murder of Jennifer Joseph. On May 18, he was charged with the murders of seven additional Spokane women, as well as the attempted murder and attempted robbery of a ninth Spokane woman. Yates's public defender, Richard Fasy, "began to pursue the possibility of 'global resolution' discussions with the Spokane County Prosecuting Attorneys Office." Clerk's Papers (CP) at 2745 (Finding of Fact (FF) 2). At a mid-June meeting of the Washington Association of Prosecuting Attorneys (WAPA), Tucker, Ladenburg, and other county prosecutors met informally about Yates's case. Tucker testified that, following the meeting, he believed he had some measure of consent to handle the Pierce County murders because Ladenburg "didn't say I couldn't handle them." 14 VRP at 649-50. Ladenburg testified that he never gave Tucker permission to handle the Pierce County cases and that he

did not believe Tucker was seriously contemplating a plea resolution at that time. The trial court found that, "[b]ased on the conversations at that meeting with the prosecuting attorneys, including John W. Ladenburg, and based on the prosecutorial protocol of handling multi-venue prosecutions in one venue, Mr. Tucker believed and had reason to believe that he had the authority to prosecute the Pierce County murders . . . . Mr. Tucker subsequently conveyed that understanding to defense counsel, Mr. Fasy." CP at 2745 (FF 3).

¶13 After the WAPA conference, some media reports raised Ladenburg's concern that Tucker was seriously considering a Yates plea bargain. According to the trial court's finding, Ladenburg took the following action:

> When it became apparent to the Pierce County Prosecutors Office that Mr. Tucker was anticipating plea negotiations which included the possible elimination of the death penalty a phone conference was arranged between Mr. Tucker, Mr. Ladenburg, and other death penalty familiar prosecutors . . . . During that call, Mr. Ladenburg expressed his disapproval of Mr. Tucker's suggestion that he might plea bargain the death penalty in this case at this juncture. Mr. Ladenburg also told Mr. Tucker that if he was considering plea bargaining the death penalty Mr. Ladenburg would not allow Mr. Tucker to handle the Pierce County cases. *During this phone call Mr. Ladenburg revoked any and all authority implied or otherwise that he had given to Mr. Tucker to prosecute or plea bargain the Pierce County murder cases that are the subject of this matter.*

*Id.* (FF 4) (emphasis added). Ladenburg suggested that the call occurred within days of the WAPA conference. Tucker testified that it occurred on June 28. The trial court found that the discussions between Tucker and Yates's attorney "became more 'concrete' " at the end of June: "The window of time for these discussions was June 28 to July 17, 2000." *Id.* (FF 2).

¶14 Despite the June phone call following the WAPA conference, "[o]n July 1, 2000 Mr. Tucker made the decision to proceed with a plea agreement with the defendant" and,

on July 13, faxed to Ladenburg a draft plea agreement that included the Pierce County murders. *Id.* at 2746 (FF 6). Three days later, Tucker faxed a letter to Ladenburg "requesting written authorization to file the Pierce County cases in Spokane County." *Id.* (FF 7). On the following day, Monday, July 17, 2000, Ladenburg notified Tucker by letter and voice mail that Pierce County would file its own cases in Pierce County. On that same day, Ladenburg's office filed an information charging Yates with two counts of first degree murder with aggravating circumstances.

¶15 After the Pierce County charges were filed, Tucker and Yates's attorney continued to negotiate a plea agreement for the 10 Spokane murders. Although the July 13 draft had required Yates to disclose the location of Melody Murfin's remains and to assist in locating the .25 caliber handgun he had used in some of the murders, Yates did not disclose the location of Murfin's remains until October 2000, and he "never provided any assistance in the location of the .25 caliber handgun." *Id.* (FF 6). On October 13, 2000, three months after Tucker's initial draft and the filing of the Pierce County charges, Yates and the Spokane County Prosecuting Attorney entered into a plea agreement. The agreement provided that, in exchange for Yates's guilty plea to 13 counts of first degree murder (10 in Spokane County, 2 in Walla Walla County, and 1 in Skagit County), as well as 1 count of attempted first degree murder in Spokane County, the Spokane County Prosecuting Attorney would not seek the death penalty.

¶16 Analysis. The doctrine of equitable estoppel is grounded in the principle "that a party should be held to a representation made or position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon." *Wilson v. Westinghouse Elec. Corp.*, 85 Wn.2d 78, 81, 530 P.2d 298 (1975). A party seeking the protection of the doctrine must establish three elements: "(1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission,

statement or act; (3) injury to such other party resulting from permitting the first party to contradict or repudiate such admission, statement, or act." *Id.* Application of equitable estoppel against the government is disfavored. *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 599, 957 P.2d 1241 (1998) (citing *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993)). A party asserting equitable estoppel against the government must establish, in addition to the three elements set forth above, that equitable estoppel (1) is "necessary to prevent a manifest injustice" and (2) would not "impair[ ]" "the exercise of governmental functions." *Kramarevcky*, 122 Wn.2d at 743. A party must prove all required elements by clear, cogent, and convincing evidence. *Id.* at 744.

¶17 As a threshold matter, Yates has provided no authority supporting the extension of the doctrine of equitable estoppel into the realm of criminal prosecutions. No Washington case has applied the doctrine to criminal cases, and federal authority exists discrediting such an application. In *United States v. Anderson*, 637 F. Supp. 1106 (D. Conn. 1986), a case involving criminal prosecution for failure to file federal income tax returns, the court "found no authority to support the defendant's contention that the doctrine of equitable estoppel may ever be invoked to defeat a criminal prosecution" and observed that "doctrines of equity, which typically can be invoked only by persons who have demonstrated their own 'clean hands,' seem unsuitable for general incorporation into the criminal law." *Id.* at 1109. Likewise, in *United States v. Alexander*, 736 F. Supp. 968 (D. Minn. 1990), the court rejected the argument—whether based on equitable estoppel or due process—that the government's delayed obscenity prosecution had to be foreclosed. The *Alexander* court noted that "[n]o case has been cited to the court involving an equitable estoppel in a criminal prosecution" and that, "[i]n fact, authority exists for the proposition that it is inapplicable in a criminal matter." *Id.* at 993 (citing *Anderson*, 637 F. Supp. 1106).

¶18 We hold that a criminal defendant may not rely on equitable estoppel to challenge a plea agreement. Here,

Yates attempts to use equitable estoppel to gain what amounts to specific performance of a promise allegedly made in the context of plea negotiations—that is, Pierce County's alleged promise not to seek the death penalty for Yates's murders of Mercer and Ellis. As this court recently held in *State v. Bisson*, 156 Wn.2d 507, 130 P.3d 820 (2006), specific performance of a provision in a plea agreement is available "only where the prosecutor's promise was not susceptible to more than one meaning." *Id.* at 524. Given that a defendant is not entitled to specific performance of an ambiguous provision *in the written plea agreement itself*, a defendant certainly should not be permitted to invoke equitable estoppel as a means of gaining specific performance of a nebulous, disputed, unwritten agreement between two county prosecutors. A defendant's reliance on equitable estoppel in the plea-bargaining context would not only create some murkiness in our law governing plea agreements, it could well have a chilling effect on the plea-bargaining process itself, making prosecutors reluctant to engage in such negotiations. We conclude that case law and public policy foreclose a defendant's use of equitable estoppel to alter the outcome of the plea-bargaining process.

¶19 Even if we were to permit a defendant to rely on equitable estoppel to seek enforcement of a promise allegedly made during plea negotiations, Yates's equitable estoppel argument would be unavailing. The trial court properly concluded that Yates had failed to provide clear, cogent, and convincing evidence of the essential elements of an equitable estoppel claim against the government. CP at 2747 (Conclusion of Law (CL) 1).[7] Ample support for that conclusion of law is found in the unchallenged factual findings (in particular, findings of fact 2-3 and 6-10), as well as in testimony establishing that by June 28 Ladenburg had

[7] Specifically, the trial court concluded that Yates had failed to meet his burden regarding the third, fourth, and fifth equitable estoppel elements set forth above. CP at 2747-48 (CL 2, 4). Yates did not assign error to conclusions of law 2 and 4; rather, his general assignments of error appear to pertain to conclusions of law 3 and 5. *See* Br. of Appellant at 2 (Assignments of Error 2-3).

notified Tucker that Tucker could not handle the Pierce County murders if his intent was to plea bargain the death penalty. The record contains no evidence that Pierce County ever promised Yates that it would forbear seeking the death penalty, nor does the record establish that Pierce County authorized the Spokane County prosecutor to include the Pierce County murders in a plea agreement eliminating the death penalty. Additionally, Yates has not identified any substantive evidence that he disclosed prior to July 17, 2000, in reliance on the alleged promises from Pierce County, and he has thus been unable to establish any consequential detriment or injury. Finally, Pierce County persuasively argues that estopping Pierce County from seeking the death penalty would "impair[ ]" "the exercise of governmental functions" by encroaching upon the sovereign right of the Pierce County Prosecuting Attorney to determine how crimes within Pierce County should be prosecuted. *Kramarevcky*, 122 Wn.2d at 743; Br. of Resp't at 63-64; *see State v. Bryant*, 146 Wn.2d 90, 100-04, 110-12, 42 P.3d 1278 (2002) (Chambers, J., majority; Owens, J., dissenting) (holding that one county's prosecutor lacks actual or apparent authority to bind another county's prosecutor to an immunity agreement with a witness). We affirm the trial court's rejection of Yates's equitable estoppel argument.

b. Fundamental Fairness

¶20 In addition to appealing the trial court's denial of his equitable estoppel motion, Yates raises for the first time on appeal his claim that Pierce County's decision to seek the death penalty violated the guaranty of fundamental fairness inherent in the due process clause of the Fourteenth Amendment. Yates's argument is, in essence, that the doctrine of fundamental fairness entitles him to specific performance of Pierce County's alleged promise to forgo the death penalty. Even if we were to assume that Pierce County had offered to forgo the death penalty in exchange

for Yates's guilty plea (and there is no evidence that Pierce County ever extended such an offer), the doctrine of fundamental fairness provides no basis for specific performance of that plea proposal.

¶21 In *State v. Wheeler*, 95 Wn.2d 799, 631 P.2d 376 (1981), this court considered as an issue of first impression whether a defendant was entitled to specific performance of a prosecutor's initial plea proposal. As the court unequivocally stated, "[t]he weight of authority is that, absent some detrimental reliance by the defendant, the State may withdraw from any plea agreement prior to the actual entry of a guilty plea." *Id.* at 803. The *Wheeler* court explicitly rejected the notion that " 'the right to fundamental fairness embraced within substantive due process' " required enforcement of a plea proposal. *Id.* at 803-04 (quoting *Cooper v. United States*, 594 F.2d 12, 18 (4th Cir. 1979), *abrogated by Mabry v. Johnson*, 467 U.S. 504, 104 S. Ct. 2543, 81 L. Ed. 2d 437 (1984)). In the words of the *Wheeler* court, "[a] defendant does not have a constitutional right to plea bargain, *see Weatherford v. Bursey*, 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977), and thus the failure to enforce a plea *proposal*, as opposed to an 'accepted' offer, cannot violate substantive due process." *Id.* at 804. Accordingly, we reject Yates's argument because the doctrine of fundamental fairness is inapplicable to proposals made in the context of plea negotiations.[8]

¶22 2. *Jury Selection*. Yates contends that the trial court violated his federal and state constitutional right to a fair and impartial jury by granting the State's challenges to jurors 39, 52, and 74; by denying the defense's challenges to jurors 9, 29, 100, and 120; and by disallowing the defense's proposed voir dire questions regarding religious affiliation.

[8] Under *Wheeler*, Yates's only avenue for gaining specific performance of the alleged proposal is to prove that Pierce County in fact made such a proposal and that he detrimentally relied on it. Just as Yates was unable to establish the first three elements of his equitable estoppel claim—i.e., that he was injured by Pierce County's reversal of its alleged offer to plea bargain the death penalty—he failed to show that Pierce County made such a proposal and that he detrimentally relied on it.

a. Trial Court's Exclusion of Jurors 39, 52, and 74 for Cause

¶23 Yates contends that the trial court improperly granted the State's challenges to jurors 39, 52, and 74. Under the Sixth Amendment to the federal constitution and article I, section 22 of the Washington State Constitution, a defendant has a right to an impartial jury. *State v. Brown*, 132 Wn.2d 529, 593, 940 P.2d 546 (1997); *State v. Brett*, 126 Wn.2d 136, 157, 892 P.2d 29 (1995), *vacated on other grounds sub nom. In re Pers. Restraint of Brett*, 142 Wn.2d 868, 16 P.3d 601 (2001). To ensure an impartial jury, the trial court in a capital case must "death qualify" the jury—that is, the court must satisfy itself that prospective jurors will be able to impose the death penalty if the State meets its statutorily mandated burden. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985); *Brown*, 132 Wn.2d at 593. Thus, the trial court may dismiss for cause any juror whose views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)); *State v. Davis*, 141 Wn.2d 798, 856-57, 10 P.3d 977 (2000). When dismissing an equivocal juror—one who expresses personal opposition to the death penalty yet offers some assurances that he or she could set aside those views—the trial court need not find the juror's bias " 'unmistakably clear' "; rather, the court must be "left with [a] definite impression" of the juror's inability to apply the law impartially. *Witt*, 469 U.S. at 424-26 (rejecting the test set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)).[9]

[9] Yates relies on *Hance v. Zant*, 696 F.2d 940 (11th Cir. 1983), but the *Witt* Court expressly rejected the Eleventh Circuit's holding that jurors could be excused only where their opposition to the death penalty was automatic and unequivocal. *Witt*, 469 U.S. at 424.

¶24 Because "a juror's competency to serve impartially" is a credibility determination that the trial court is necessarily in the best position to make, this court applies a deferential standard of review and will reverse the trial court's determination only if the court has manifestly abused its discretion. *State v. Rupe*, 108 Wn.2d 734, 749, 743 P.2d 210 (1987); *Witt*, 469 U.S. at 428-29; *Brown*, 132 Wn.2d at 601-02; *Uttecht v. Brown*, 551 U.S. ___, 127 S. Ct. 2218, 2224, 167 L. Ed. 2d 1014 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

¶25 As a prospective juror in the case, juror 39 filled out the lengthy written questionnaire. She responded "[n]o" to the following question: "In your opinion, should death ever be imposed as a sentence for punishment of a crime?" Confidential Juror Questionnaire (CJQ) 39, at 29. Asked to indicate "[w]hich of the following best describe[d] [her] view of the death penalty," she marked the box "Opposed in *every possible circumstance*." *Id.* (emphasis added). She left blank the questions asking for the best arguments for and against the death penalty. *Id.* at 30. When the State questioned juror 39 individually (and outside the presence of other jurors), she stated that her views on the death penalty were based on "a philosophy of [hers], [her] personal opinion." 34 VRP at 2276. She affirmed three times that she was opposed to the death penalty in every circumstance. *Id.* at 2275-77. She later indicated that she could vote to impose the death penalty, *id.* at 2279, and she admitted the response was contradictory. *Id.* at 2280. Defense counsel's leading question elicited an ambiguous response:

> Q And your firm belief that—your strong belief that the death penalty, you're generally opposed to it, won't affect your ability to follow his instructions; is that right?
>
> A No.

*Id.* at 2282. It is unclear whether juror 39 was agreeing with defense counsel's statement or responding negatively

to the tag question "is that right?" The trial court followed up:

> I need to understand your answers. . . .
>
> . . . .
>
> . . . Would you ever vote for the death penalty?

A I want to say, because my beliefs says, no. I would do that if it has occurred, yes, if I'm supposed to, weighing all the evidence, yes.

*Id.* at 2282-83.

¶26 Weighing the State's motion to excuse juror 39 for cause, the trial court pointed to her written responses that the death penalty should never be imposed and that she was "opposed in every possible circumstance." *Id.* at 2286. The trial court granted the State's motion: "I'm convinced that her ability is substantially impaired by her personal beliefs, and even in response to my question she drew upon her personal beliefs." *Id.* Here, the trial court's ruling was not a manifest abuse of discretion. The court weighed her written and oral responses before concluding that her personal views would substantially impair her ability to impose the death penalty.[10]

¶27 Juror 52 responded "[n]o" to the following written question: "In your opinion, should death ever be imposed as a sentence for punishment of a crime?" CJQ 52, at 29. To describe her view of the death penalty, she checked the box "Generally opposed with very few exceptions." *Id.* Asked to "state in greater detail [her] opinion about the death

---

[10] The dissent contends that the United States Supreme Court's most recent opinion regarding death qualification does not support juror 39's dismissal. Dissent at 803 (discussing *Uttecht,* 127 S. Ct. at 2230). In *Uttecht,* the Supreme Court affirmed juror Z's dismissal because he misstated and misunderstood the law and thereby demonstrated his substantial impairment in his ability to impose the death penalty. Contrary to the dissent's implication, a prospective juror can demonstrate substantial impairment without misstating or misunderstanding the law. After extensive questioning, the trial court in the instant case determined that juror 39's inability to separate her personal beliefs from her ability to impose the death penalty rendered her substantially impaired. In accordance with *Uttecht,* we give this finding great weight and affirm the trial court's dismissal of juror 39.

sentence," she wrote, "I guess because I've been brought up in church we're not to take a life." *Id.* Similarly, her "best argument against the death penalty" was that "[n]o one has the right to take another life." *Id.* at 30. In response to questions from the State, she explained that she was a lifelong member of the Church of God and Christ, which opposed ever taking a life. 35 VRP at 2403-04. When asked whether she could vote for the death penalty, she reiterated that her religious views made such a question uncomfortable for her: "Would I vote? That's a hard thing, because it's like going against what I've been taught to go against, to take a life." *Id.* at 2410, 2412. However, under questioning by defense counsel, juror 52 responded affirmatively to a series of questions regarding civic duty and her ability to follow the law impartially. *Id.* at 2413-15.

¶28 The trial court granted the State's motion to excuse juror 52 for cause. *Id.* at 2418. The court concluded that juror 52's "religious beliefs and personal commitment are such that she would decline the death penalty in the case." *Id.* While the trial court heard her responses to defense counsel's structured questioning, the court reasonably concluded that such responses were of less consequence than her written and oral statements about the importance of her church's teachings on capital punishment. *See Patton v. Yount*, 467 U.S. 1025, 1039, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (observing that the trial court "properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading"). The ruling was not a manifest abuse of the trial court's discretion.

¶29 In her written responses, juror 74 unequivocally expressed her "[v]ery" strong opposition to the death penalty. CJQ 74, at 29. She stated that the death penalty should never be imposed and described her view of the death penalty by checking the box "Opposed in *every possible circumstance.*" *Id.* (emphasis added). She wrote that she did not "believe in the death penalty," that a "person's life [was] not [hers] to take," and that there was

"[n]o good argument" for the death penalty. *Id.* at 29, 30. In response to the State's questioning, she affirmed her written answers and explained that her views, which she had held for "[m]ost of [her] adult life," were based on a religious and philosophical belief "that if we cause another human being death, we come down to the level of that person." 37 VRP at 2686. Juror 74 admitted that there was "probably" no possibility she could vote for the death penalty because "it would be a real difficult thing for [her] to do" and "would cause [her] an extreme amount of anxiety." *Id.* at 2686-87. When defense counsel asked her if she could follow the court's instructions impartially, her answer was equivocal: "Yeah, if I had to, *probably.*" *Id.* at 2687-88 (emphasis added).

¶30 The trial court's decision to grant the State's motion to exclude juror 74 for cause was plainly no abuse of discretion. In light of her emphatic written and oral statements, the court reasonably concluded "that her beliefs or opinions would substantially impair the performance of her duties as a juror." *Id.* at 2691.

b. Trial Court's Failure To Exclude Jurors 9, 29, 100, and 120 for Cause

¶31 Yates claims that the trial court abused its discretion when it denied his motions to excuse jurors 9, 29, 100, and 120 for cause. Because Yates exercised a peremptory challenge following the denial of each motion, none of the four prospective jurors was seated on his panel. Moreover, at the close of voir dire, Yates retained three unused peremptory challenges. CP at 3746. On these facts, Yates cannot establish a Sixth Amendment violation. In *United States v. Martinez-Salazar*, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000), the Supreme Court held that, where a defendant exercises a peremptory challenge after the court denies a defense motion to excuse the juror for cause, any potential violation of the defendant's Sixth Amendment right to an impartial jury is cured. *Id.* at

316-17; *see State v. Roberts*, 142 Wn.2d 471, 518, 14 P.3d 713 (2000) (holding that, "because Roberts has not demonstrated that jurors who should have been removed for cause actually sat on the panel, his rights were not violated"); *State v. Fire*, 145 Wn.2d 152, 165, 34 P.3d 1218 (2001) (holding that, even where defendant who has used peremptory challenge after denial of motion to exclude juror for cause ultimately exhausts peremptory challenges, defendant cannot demonstrate prejudice if "convicted by a jury on which no biased juror sat"). Thus, even if Yates could establish that the trial court erroneously denied his motions to excuse these four jurors for cause, he would be unable to establish a constitutional violation.

c. Trial Court's Ruling on Proposed Voir Dire Regarding Religious Affiliations

¶32 The scope of voir dire is within the trial court's sound discretion. *State v. Robinson*, 75 Wn.2d 230, 231, 450 P.2d 180 (1969). The trial court's ruling regarding the scope of voir dire may not be disturbed on appeal "[a]bsent an abuse of discretion and a showing that the accused's rights have been substantially prejudiced thereby." *State v. Frederiksen*, 40 Wn. App. 749, 752-53, 700 P.2d 369 (1985) (citing *United States v. Robinson*, 154 U.S. App. D.C. 265, 475 F.2d 376, 380 (1973)). Ordinarily, an individual's religious affiliations and beliefs are not proper subjects of inquiry during voir dire. *See State v. Davis*, 504 N.W.2d 767, 772 (Minn. 1993); *see also* WASH. CONST. art. I, § 11 (providing, in part, that no person "shall . . . be incompetent as a witness or juror, in consequence of his opinion on matters of religion"). Such questions may be proper, however, if the case involves religious issues "or if the information is a necessary predicate for a voir dire challenge." *Davis*, 504 N.W.2d at 772. The trial court in the present case reasonably permitted the written jurors' questionnaire to explore whether a juror's religious views would

compromise his or her ability to apply impartially the law regarding the death penalty.[11]

¶33 Yates claims that the trial court erred when it refused to include the following proposed questions in the jurors' written questionnaire:

1. What is your religious affiliation, if any?
2. What is the fundamental teaching of your religion?
3. What influence has religion had in your life?
4. Describe your religious beliefs or philosophy.

CP at 2827. Expressing reservations about the first question, the trial court rejected it, subject to "getting some additional information from [the defense] or the State on whether that *direct* question can be asked"; the court apparently received no supplemental information. 23 VRP at 1200 (emphasis added). Regarding the three additional questions, the trial court invited counsel to expand questions 102 and 103, which inquired into the effect of the jurors' religious beliefs on their ability to impose the death penalty. *See supra* note 11. However, here again, nothing in the record suggests that the defense sought any modification of the two questions. 23 VRP at 1190-91, 1200-01. Additionally, the trial court expressly stated that counsel could "appropriate[ly] . . . ask follow-up questions" of any jurors who responded affirmatively to the question, "Do you have any *religious* or philosophical views which may cause you to feel uncomfortable sitting as a juror in a criminal case?" 32 VRP at 1791; CP at 3281 (emphasis added). The record shows that the attorneys were permitted to follow up on questionnaire responses regarding the effect of a juror's

---

[11] For example, question 102 provided as follows: "Do you hold beliefs or convictions, whether moral or religious or philosophical, that would cause you to automatically vote *against* a death sentence without regard to any evidence that might be presented at the trial? . . . Do you belong to any groups that have taken a position on the death penalty? . . . If yes, what group(s)?" CP at 3302. Question 103 asked the converse question: "Do you hold beliefs or convictions, whether moral or religious or philosophical, that would cause you to automatically vote *in favor of* a death sentence if you found evidence for a guilty verdict for Aggravated First Degree Murder?" *Id.*

religious beliefs on his or her ability to impose the death penalty. *See, e.g.*, 35 VRP at 2403-04, 2408-15; 36 VRP at 2507. In some instances, defense counsel asked jurors directly about their notions of mercy. *See, e.g.*, 33 VRP at 1971; 39 VRP at 2965, 3001; 40 VRP at 3244.

¶34 Because the trial court gave Yates ample latitude to explore the prospective jurors' religious beliefs as they related to the death penalty, Yates cannot show that the trial court's tentative rejection of his proposed question on religious affiliation "substantially prejudiced" his rights to a fair jury. *Frederiksen*, 40 Wn. App. at 753. In light of the foregoing facts, we conclude that the trial court's ruling regarding Yates's proposed voir dire questions was not an abuse of discretion.

¶35 3. *Jury Instruction on "Common Scheme or Plan."* Yates argues that the trial court substantially lowered the State's burden of proof by improperly defining, in jury instruction 20, the aggravating circumstance of RCW 10.95.020(10): commission of the murders as "part of a common scheme or plan."[12] Appellate courts review de novo any claimed errors in jury instructions. *Brown*, 132 Wn.2d at 605.

¶36 Because the phrase "common scheme or plan" consists of commonly understood words, the trial court was not required to instruct the jury regarding the definition of the phrase. *Id.* at 611-12. In this case, however, the trial court, after considering proposed instructions from the defense and the State, provided the following instruction on the definition of "common scheme or plan":

> A "common scheme or plan" means there is a connection between the crimes in that one crime is done in preparation for the other.
>
> A "common scheme or plan" also occurs when a person devises an overarching criminal plan and uses it to perpetrate separate but very similar crimes.

---

[12] "There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person." RCW 10.95.020(10).

CP at 4106 (Jury Instruction 20). The court's instruction and the State's proposed instruction[13] relied on the two alternative definitions of "common scheme or plan" that this court embraced in *State v. Lough*, 125 Wn.2d 847, 889 P.2d 487 (1995), for purposes of defining "common scheme or plan" under ER 404(b):

> There are two different situations wherein the "plan" exception to the general ban on prior bad acts evidence may arise. *One is where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan.* . . . A simple example would be a prior theft to acquire a tool or weapon to perpetrate a subsequently executed crime. *The other situation arises when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.*

*Id.* at 854-55 (emphasis added). Rejecting the notion that the prior act had to be causally connected to (and done in preparation for) the charged act, the *Lough* court concluded that under ER 404(b) the State, in order to prove the charged crimes of indecent liberties and attempted rape, was entitled to present evidence that the defendant had previously drugged and raped four other women in much the same manner. *Id.* at 855-61.

¶37 In the present case, Yates argues that the trial court erred when it defined "common scheme or plan" in RCW 10.95.020(10) by relying on the *Lough* court's definition of the phrase for purposes of ER 404(b). Yates's argument is unpersuasive for at least two reasons. First, Yates ignores this court's earlier reliance on *Lough* in *State v. Pirtle*, 127 Wn.2d 628, 904 P.2d 245 (1995). In *Pirtle*, the court turned to "the traditional understanding of common scheme or plan within the rules of evidence" and specifically stated

---

[13] The State proposed the following instruction:

> A "common scheme or plan" means there is a connection between the crimes in that one crime is done in preparation for the other or where crimes are part of a general criminal purpose.
>
> A general criminal purpose occurs when a person devises a general plan, and uses it to perpetrate separate but very similar crimes.

CP at 3974 (State's Proposed Jury Instruction 17).

that "[t]his understanding . . . sheds light on the nature of the connection needed between the murders" for purposes of RCW 10.95.020(10). *Id.* at 662. The *Pirtle* court quoted only the first of the two *Lough* alternatives because Pirtle's murders were committed as " 'constituent parts of a plan in which each crime is but a piece of the larger plan.' " *Id.* (quoting *Lough*, 125 Wn.2d at 855). The *Pirtle* court found "ample evidence" that the murder of the second Burger King employee was connected to Pirtle's "larger criminal purpose" of robbing the Burger King and killing the first victim. *Id.* at 663. While the facts in *Pirtle* were applicable only to the first of the *Lough* court's alternative definitions of "common scheme or plan," the *Pirtle* court nonetheless broadly declared the *Lough* court's ER 404(b) definition a source of enlightenment for interpreting the same phrase in RCW 10.95.020(10).

¶38 Additionally, the second of the *Lough* court's alternative definitions of "common scheme or plan" comports with legislative intent. Were this court to adopt Yates's narrow notion of the "common scheme or plan" aggravator, the court would necessarily be holding "that the legislature did not intend to enact an aggravating circumstance applicable to serial killers who use the same plan or formula over an extended period of time to kill multiple victims." Br. of Resp't at 103; *see id.* at 104 (describing legislative history).[14] We reject such a notion.

¶39 Thus, we hold that in jury instruction 20 the trial court properly defined "common scheme or plan."

¶40 4. *Sufficiency of Evidence Regarding "Aggravating Circumstances."* Yates concedes that the evidence was sufficient to prove beyond a reasonable doubt that he mur-

[14] For an application of the "common scheme or plan" aggravator to a serial killer, *see* "Statement of Defendant on Plea of Guilty," at 7, *State v. Ridgway*, No. 01-1-10270-9 (King County Super. Ct., Wash.), *available at* http://www.metrokc.gov/kcsc/rulings/ridgway.htm: "I have discussed with my attorneys the 'common scheme or plan' aggravating circumstance charged in all these murders. I agree that each of the murders I committed was part of a 'common scheme or plan.' The plan was: I wanted to kill as many women I thought were prostitutes as I possibly could. . . . Another part of my plan was where I put the bodies of these women."

dered Mercer and Ellis with premeditated intent.[15] As defense counsel told the jury in his opening statement,

> Mr. Yates has waited patiently for almost two years for me to say to you that he killed Melinda Mercer and Connie LaFontaine Ellis. He did.
>
> We are in trial because the State, through the Pierce County prosecutor, has decided that these are not premeditated murders as Mr. Yates has pled guilty to in Spokane, but premeditated murder with aggravating circumstances.

50 VRP at 4366.

¶41 However, Yates argues that the State's evidence was insufficient to prove beyond a reasonable doubt the existence of the three alleged "aggravating circumstances"—that is, that he committed the murders as "part of a common scheme or plan," "in furtherance of . . . [r]obbery," and "to conceal the commission of a crime." RCW 10.95.020(10), (11)(a), (9). In challenges to the sufficiency of the evidence, "we review the evidence in the light most favorable to the State" to determine whether any rational trier of fact could have found the presence of the aggravating factor beyond a reasonable doubt. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004); *Brown*, 132 Wn.2d at 607. Circumstantial and direct evidence are deemed equally reliable. *Varga*, 151 Wn.2d at 201.

### a. Commission of Murders as "part of a common scheme or plan" (RCW 10.95.020(10))

¶42 As discussed above, to prove the "common scheme or plan" aggravating factor, the State was required to show that Yates "devise[d] an overarching criminal plan and use[d] it to perpetrate separate but very similar crimes." CP at 4106 (Jury Instruction 20). Relying on additional evidence

---

[15] "A person is guilty of murder in the first degree when . . . [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a).

from the Spokane murders,[16] the State showed that Yates "devise[d] an overarching criminal plan" to lure into his vehicle white or light-skinned women who worked in prostitution (predictably due to drug addiction), negotiate a sex act, kill them by shooting them in the head with a small caliber handgun (encasing their heads in plastic bags to ensure their deaths and to prevent their blood from saturating his vehicle), undress their bodies for purposes of finding the money they were carrying, and transport their bodies to dump sites in secluded areas. The State argued that the murders of Mercer and Ellis constituted "separate but very similar crimes" committed pursuant to that "overarching plan." *Id.* Mercer and Ellis, women who worked in prostitution to support drug habits, were shot in the head with a small caliber handgun; their heads were encased in plastic grocery bags; and their bodies were transported from the scene of the killing to a dump site. 65 VRP at 6924-26; Br. of Resp't at 21.

¶43 Yates does not dispute the State's evidence; rather, he rests his challenge on the unpersuasive contention that the trial court incorrectly defined "common scheme or plan" in jury instruction 20. Viewing the evidence in the light most favorable to the State, we hold that "any rational trier of fact could have found" that Yates's murders of Mercer and Ellis were "part of a common scheme or plan." *Brown*, 132 Wn.2d at 607; RCW 10.95.020(10).

---

[16] On a pretrial motion from the State, the trial court ruled that evidence of Yates's 10 Spokane County murders was "relevant to prove identity [and motive] of the murderer of Ms. Mercer and Ms. Ellis" and "to prove that the murderer of Ms. Mercer and Ms. Ellis acted with premeditation." CP at 3073; *see* ER 404(b) (stating that "[e]vidence of other crimes . . . may . . . be admissible . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity"). The court also concluded that the evidence of Yates's Spokane murders was "relevant to prove the aggravator of 'common scheme or plan' as defined by RCW 10.95.020(10)." CP at 3070-74, 320-44, 1660. For a summary of the evidence, *see* Br. of Resp't at 32-44; *see also supra* pp. 728-29.

b. Commission of Murders "in furtherance of . . . [r]obbery" (RCW 10.95.020(11)(a))

¶44 Yates claims that the evidence was insufficient to establish that he committed the murders "in furtherance of . . . [r]obbery." RCW 10.95.020(11)(a). RCW 9A.56.190 provides that "[a] person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury." The murder and the robbery must be "in 'close proximity in terms of time and distance,' " and they must be causally connected. *Brown*, 132 Wn.2d at 608 (quoting *State v. Leech*, 114 Wn.2d 700, 706, 790 P.2d 160 (1990)).

¶45 The State presented evidence that women engaged in prostitution typically require payment prior to the negotiated sexual act and that, because they are often robbed, they commonly hide their money in their shoes, brassieres, or underwear. 50 VRP at 4432-33. On the evening that Mercer was last seen, she was wearing a tank top, a brassiere, a floral skirt, shoes, a denim jacket, and a black coat, and she was carrying a purse. 55 VRP at 5326-28, 5344-45. However, when Mercer's nude body was discovered the following day, her tank top, brassiere, shoes, and purse were missing, and no cash was found on or near her body. *Id.* at 5385-86; 56 VRP at 5468. Similarly, Ellis's body was found clothed in a blouse, jeans, and socks, but lacking undergarments; a single shoe was found some distance from the body, and no purse or money was found nearby. 57 VRP at 5752-54; 58 VRP at 5906-07. Additionally, the State provided evidence that Yates and his wife had money problems that prompted them to make periodic inquiries regarding Yates's paychecks for National Guard duty. 58 VRP at 5831-33.

¶46 Viewed in the light most favorable to the State, the State's circumstantial evidence could have persuaded a rational trier of fact that Yates murdered Mercer and Ellis

in furtherance of robbery. The jury could have reasonably believed that Yates negotiated the price of a sexual act, paid up front, murdered the women, and then took their money, disturbing or taking articles of clothing in which the women were likely to have concealed their money.

c. Commission of Murders "to conceal the commission of a crime" (RCW 10.95.020(9))

¶47 Yates contends that the evidence was insufficient to support the third alleged aggravating factor—that he committed the murders of Mercer and Ellis "to conceal the commission of" the crime of patronizing a prostitute. RCW 10.95.020(9); RCW 9A.88.110(1)(c), (3). The State presented the testimony of Jennifer Robinson to establish that Yates was anxious to avoid being identified by the police as a person who hired prostitutes. According to Robinson, Yates picked her up on November 9, 1998, and asked for oral sex. When a police car pulled up behind them, Yates told Robinson to tell the police officer that Yates knew her father and was giving her a ride home. After the officer allowed them to move on, Yates seemed "really nervous" and "really scared"; he dropped Robinson off some blocks away and steadfastly declined any interest in the sex act previously requested. 53 VRP at 5007. Additionally, the State presented evidence that Yates had applied for a full-time position with the National Guard and that a prosecution for patronizing prostitutes would have adversely affected his potential for advancing in the military. 58 VRP at 5830-31, 5826-27.

¶48 Even when viewed in the light most favorable to the State, this circumstantial evidence is insufficient to prove that Yates murdered Mercer and Ellis to conceal the misdemeanor crime of patronizing prostitutes. If Yates had killed every prostitute he patronized, one could rationally infer that he intended to eliminate any evidence that he had committed the misdemeanor of patronizing prostitutes, but as the defense showed, Yates patronized other prostitutes without killing them.

¶49 In sum, the evidence was sufficient to prove to a rational trier of fact that Yates committed the murders of Mercer and Ellis as "part of a common scheme or plan" and "in furtherance of . . . [r]obbery." RCW 10.95.020(10), (11)(a).

¶50 5. *Sufficiency of Second Amended Information.* Under Washington's capital punishment statutes, the jury must make three factual determinations before the death penalty can be imposed. First, the jury must conclude that the State has proved beyond a reasonable doubt the elements of the substantive crime of first degree murder: "A person is guilty of murder in the first degree when . . . [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a).[17] Second, likewise in the guilt phase, the jury must conclude that the State has proved beyond a reasonable doubt the existence of at least one of the "aggravating circumstances" set forth in RCW 10.95.020: "A person is guilty of aggravated first degree murder, a class A felony, if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a) . . . and one or more of the following aggravating circumstances exist."[18] Third, at the close of "the special sentencing proceeding," the jury must unanimously answer the following question affirmatively: " 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' " RCW 10.95.060(4).[19]

¶51 The second amended information charged Yates with two counts of "the crime of MURDER IN THE FIRST DEGREE WITH AGGRAVATING CIRCUMSTANCES." CP at 1003-04. As to count

---

[17] *See* CP at 4099, 4108 (Jury Instructions 13, 22); CP at 4163 (Verdict Form A Count I (Melinda Mercer)); CP at 4167 (Verdict Form B Count II (Connie Ellis)).

[18] *See* CP at 4100, 4109 (Jury Instructions 14, 23); CP at 4164-65 (Special Verdict Aggravating Circumstances Count I (Melinda Mercer)); CP at 4168-69 (Special Verdict Aggravating Circumstances Count II (Connie Ellis)).

[19] *See* CP at 4445 (Jury Instruction 4 (Special Sentencing Hr'g)); CP at 4481 (Sentencing Verdict).

I, the information specified that Yates "with premeditated intent to cause the death of another person, did shoot Melinda L. Mercer, thereby causing the death of Melinda L. Mercer," and it asserted that "aggravated circumstances exist, to-wit: the murder was committed in the course of, in furtherance of, or in immediate flight from the crime of robbery in the first or second Degree and/or defendant committed the murder to conceal the commission of a crime; and/or defendant killed more than one victim and the murders were part of a common scheme or plan during the period of May 1996 through October 1998." *Id.* at 1003. The information cited RCW 9A.32.030(1)(a) and RCW 10.95.020(9), (10), and (11). *Id.* at 1004. Count II substituted the name of the second victim, Connie L. Ellis, but otherwise mirrors count I. *Id.*

¶52 Seeking reversal of his convictions, Yates asserts for the first time on appeal that the State's second amended information violated the well-settled constitutional requirement that "all essential elements of the crime must be included in the charging documents." *State v. Tandecki*, 153 Wn.2d 842, 846, 109 P.3d 398 (2005). An element is "essential" if its "specification is necessary to establish the very illegality of the behavior." *State v. Johnson*, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992) (citing *United States v. Cina*, 699 F.2d 853, 859 (7th Cir. 1983)). The purpose of the " 'essential elements rule' " is "to apprise the accused of the charges against him or her and to allow the defendant to prepare a defense." *State v. Vangerpen*, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995); *see* U.S. Const. amend. VI (providing that, "[i]n all criminal prosecutions, the accused shall . . . be informed of the nature and cause of the accusation"); Wash. Const. art. I, § 22 (stating that "[i]n criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation against him"). Specifically, Yates contends that the information failed to state "all essential elements" of the crime of aggravated first degree murder when it failed to (1) set forth the elements of first or second degree robbery, (2)

define the term "common scheme or plan," or (3) allege the absence of mitigating factors.

¶53 Yates's first two claimed defects concern the adequacy of the information's description of two of the three alleged aggravators. Yates argues that the aggravators themselves are elements of the charged crime and that, consequently, the information should have specified the elements of the underlying aggravating crime of first or second degree robbery and should have defined the term "common scheme or plan."[20] In recent decisions, however, this court has clearly "held that under the statutory scheme in Washington the aggravating factors for first degree murder are not elements of that crime but are sentence enhancers that increase the statutory maximum sentence from life with the possibility of parole to life without the possibility of parole or the death penalty." *State v. Thomas*, 150 Wn.2d 821, 848, 83 P.3d 970 (2004); *see also Brett*, 126 Wn.2d at 154 (holding that "[a]ggravating circumstances . . . are not elements of the crime, but ' "aggravation of penalty" ' factors" (quoting *State v. Kincaid*, 103 Wn.2d 304, 307, 692 P.2d 823 (1985))). Yates claims that a different result is required under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). But as the State points out, the adequacy of the charging document was not at issue in either case; rather, those decisions concerned a defendant's right to have a jury determine any facts that could increase the sentence beyond the statutory maximum for the charged crime. *Apprendi*, 530 U.S. at 477 n.3, 490; *Ring*, 536 U.S. at 597 n.4, 609; *see* 51 VRP at 4726. As explained above, at every step in the Washington death penalty scheme, the jury makes the factual determinations. Moreover, contrary to Yates's suggestion, this court's decision in *State v.*

---

[20] As noted above, this court has repeatedly held that no jury instruction defining "common scheme or plan" is warranted, since the phrase includes simple, easily understood terms. *Brown*, 132 Wn.2d at 611-12; *Pirtle*, 127 Wn.2d at 660-62.

*Goodman*, 150 Wn.2d 774, 83 P.3d 410 (2004), does not undermine our holdings in *Thomas* or *Brett*. In *Goodman*, we held that the charging document was defective because it accused the defendant of possessing "meth" but did not adequately define the word; given that "meth" could have meant various substances for which possession carried different sentences, the information did not on its face provide the defendant with clear notice of the charged crime. The information filed against Yates, however, plainly charged him with two counts of aggravated first degree murder, for which the sentence is life without parole or, in the absence of sufficient mitigating circumstances, death. RCW 10.95.030.

¶54 As to Yates's third claimed defect (the information's failure to allege the absence of mitigating circumstances), we have previously held that the absence of mitigating circumstances is not an essential element of the crime of aggravated first degree murder:

> The statutory death notice here is not an element of the crime of aggravated murder. Instead, the notice simply informs the accused of the penalty that may be imposed upon conviction of the crime. While we require formal notice to the accused by information of the criminal charges to satisfy the Sixth Amendment and art. I § 22, we do not extend such constitutional notice to the *penalty* exacted for conviction of the crime.

*State v. Clark*, 129 Wn.2d 805, 811, 920 P.2d 187 (1996) (citation omitted). The purpose of the charging document—to enable the defendant to prepare a defense—is distinct from the statutory notice requirements regarding the State's decision to seek the death penalty.[21]

¶55 We reject Yates's claim that the second amended information was constitutionally inadequate. Adhering to our prior holdings in *Thomas*, *Brett*, and *Clark*, we conclude that the information apprised Yates of the

---

[21] Pursuant to RCW 10.95.040, the State filed its "Notice of Special Sentencing Proceeding to Determine Imposition of Death Penalty" on January 12, 2001. CP at 87-89.

charges against him by defining the base crime of first degree murder and setting forth the three alleged aggravators.

¶56 6. *Jury Instruction on First Degree Murder.* The court's instructions included a "to convict" instruction for each of the two counts of first degree murder. The instructions provided that, "[t]o convict the defendant of the crime of murder in the first degree," the State must prove five elements beyond a reasonable doubt: that Yates killed Mercer and Ellis, that he acted with intent to cause the deaths, that the intent was premeditated, that Mercer and Ellis died as a result of Yates's acts, and that the acts occurred in this state. *See* CP at 4099, 4108 (Jury Instructions 13, 22). As to each count, the jury returned a verdict form stating that it found Yates guilty of the crime of first degree murder. *See id.* at 4163 (Verdict Form A Count I (Melinda Mercer)); *id.* at 4167 (Verdict Form B Count II (Connie Ellis)). Immediately following each of the "to convict" instructions on first degree murder were instructions on the State's burden of proving beyond a reasonable doubt the existence of any or all of the three alleged "aggravating circumstances." *See id.* at 4100, 4109 (Jury Instructions 14, 23). Those instructions made it clear that the jury's determination regarding aggravators was necessary only "[i]f you find the defendant guilty of premeditated murder in the first degree." *Id.* Just as the jury had to return a verdict form regarding each of the "to convict" instructions, the jury was required to return special verdict forms setting forth its unanimous determinations regarding each of the three "aggravating circumstances" on the two counts. *See id.* at 4164-65, 4168-69. For both the "to convict" instruction on first degree murder and the instruction on the alleged aggravators, the court relied on the *Washington Pattern Jury Instructions: Criminal. See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.02, 30.03 (2d ed. 1994).

¶57 Yates contends that the trial court erred in declining to give his proposed jury instruction explicitly labeling first degree murder a "lesser crime" included in the

charged crime of aggravated first degree murder. CP at 4030. Yates's proposed instruction stated that "[t]he crime of premeditated first degree murder with aggravating circumstances necessarily includes the lesser crime of premeditated first degree murder," and the instruction went on to explain that, "[w]hen a crime has been proven against a person and there exists a reasonable doubt as to which of two or more crimes that person is guilty, he or she shall be convicted only of the lowest crime." *Id.* Yates argues that by failing to adopt this instruction the trial court violated the Eighth Amendment under *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). There, the Court invalidated a state statute that left the jury with an either-or option: to convict the defendant of a crime requiring the death penalty or to acquit him. *Id.* at 635-38. In the present case, however, the jury was not presented with the constitutionally flawed all-or-nothing option in *Beck.* Rather, the court's instructions, along with the verdict forms, made it clear that the jury's task with respect to each of the two counts was to determine at the outset whether the State had proved the elements of first degree murder; only if the base crime was proved would the jury deliberate whether the alleged aggravators had been proved. Here, the jury had three options on each count: it could have found Yates not guilty of first degree murder, guilty of first degree murder without any "aggravating circumstances," or guilty of first degree murder with one or more "aggravating circumstances." We reject Yates's claim that the jury was denied an opportunity to convict him of the lesser crime of first degree murder. The trial court's rejection of Yates's proposed "lesser crime" instruction was not a violation of the Eighth Amendment.

¶58  7. *Expert Witnesses.* Yates argues that the trial court abused its discretion by admitting the expert testimony of FBI (Federal Bureau of Investigation) Agent Mark Safarik regarding crime scene analysis, and by permitting Lynn Everson to testify as an expert regarding the subculture and practices of women who work in prostitution. Yates also

contends that the trial court erred by withholding funding for his proposed defense expert on prostitution.

a. Safarik's Testimony

¶59 Under ER 702, the court may permit "a witness qualified as an expert" to provide an opinion regarding "scientific, technical, or other specialized knowledge" if such testimony "will assist the trier of fact." The two key criteria for admission of expert testimony are a qualified witness and helpful testimony. *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993), *overruled in part on other grounds by State v. Buckner*, 133 Wn.2d 63, 941 P.2d 667 (1997). We review a trial court's admission of expert testimony for an abuse of discretion. *State v. Russell*, 125 Wn.2d 24, 69, 882 P.2d 747 (1994); *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990); *see also Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979) (stating that, "[i]f the reasons for admitting or excluding the opinion evidence are 'fairly debatable', the trial court's exercise of discretion will not be reversed on appeal").

¶60 The trial court found that Safarik was a qualified expert "in the fields of crime scene investigation, analysis, and linkage assessment" and that his testimony "[would] be helpful to the jury in understanding crime scene evidence, signature and linkage assessment."[22] Safarik's testimony was relevant to showing the identity of Mercer's and Ellis's murderer and to establishing the "aggravating circumstance" of "common scheme or plan."[23] First, Yates suggests that Safarik's testimony should not have been

[22] CP at 3243. "Linkage assessment involves analyzing crime scenes to determine if there are enough different and unique aspects to a behavior manifested at a crime scene to determine if the behavior at one crime scene is linked to another crime scene." Br. of Resp't at 130-31 (citing 65 VRP at 6846-47). Because Yates did not assign error to these findings, they are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

[23] Under ER 401, " '[r]elevant evidence' " is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

admitted to show the identity of Mercer's and Ellis's murderer since Yates had not placed his identity at issue.[24] However, as the State countered, because the Yates case *did* proceed to trial, the State was bound to establish every element of first degree murder, including the fact that Yates killed Mercer and Ellis. *See* CP at 4099, 4108 (Jury Instructions 13, 22). Second, Yates suggests that Safarik's testimony amounted to an improper opinion as to Yates's guilt, given Yates's convictions for the Spokane murders and Safarik's testimony that the crime scene evidence linked the Spokane killer to the murders of Mercer and Ellis. But as this court stated in *Russell*, if an expert's testimony is admitted to show identity, the court "will not rule inadmissible the inference to be drawn from such evidence." 125 Wn.2d at 72-73. Third, Yates claims that Safarik's testimony amounted to improper propensity evidence; however, under ER 403, the trial court balanced the "probative value" of the Spokane evidence against "the danger of unfair prejudice" and ruled that a limiting instruction would cure "the only potential unfair prejudicial effect"—"that the jury might incorrectly consider the evidence as proof of defendant's propensity to commit the Pierce County murders." CP at 3072. Pursuant to ER 105, the trial court gave the following limiting instruction: "[E]vidence will be introduced by the State on the subject of the Spokane murders *for the limited purpose of* attempting to prove a common scheme or plan and for purposes of attempting to prove motive, opportunity, identity, preparation, or premeditation. *You must not consider this evidence for any other purpose in this case, which involves the deaths of two people in Pierce County.*" 65 VRP at 6839 (emphasis added). This court has often recognized that "[t]he jury is presumed to follow the instructions of the court." *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982). Yates has not shown that the trial court abused its discretion in admitting Safarik's expert testimony.

---

[24] In defense counsel's opening statement, he acknowledged that Yates admitted murdering Mercer and Ellis.

¶61 Even if we were to determine that the admission of Safarik's testimony amounted to an abuse of discretion, we would conclude that the trial court's evidentiary decision was harmless. Where evidence is improperly admitted, the trial court's error is harmless "if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). The State presented overwhelming evidence that Yates murdered Mercer and Ellis. DNA analysis showed that Mercer's blood was on Yates's jacket, that his hair was on her skirt, and that his semen was identified on vaginal and anal swabs. Forensic analysis established that Mercer was killed with the same gun used in four of Yates's Spokane murders, and records found at his home placed him in the Tacoma area at the time of Mercer's murder. Similarly, the State presented evidence that Ellis's blood was found in Yates's Ford van, that she was killed with the same gun Yates used to kill two of the Spokane victims, and that Yates was in the Tacoma area at the time Ellis was murdered. Just as, independent of Safarik's testimony, the State presented overwhelming evidence of Yates's guilt, the State presented abundant evidence, independent of Safarik's testimony, that Yates's murders of Mercer and Ellis were a product of the same criminal plan identifiable in the Spokane murders. In light of the State's evidence, any error in admitting Safarik's testimony was harmless.

b. Everson's Testimony

¶62 Yates contends that the trial court erred in permitting Lynn Everson to testify as an expert on prostitution. Yates argues, first, that Everson's practical experience was insufficient to qualify her as an expert. Working for the Spokane Regional Health District, Everson had gained 13 years of experience providing outreach services to prostitutes; she worked in the needle exchange program and personally provided prostitutes with food, clothing,

condoms, and treatment referrals. She had worked with approximately 300 individuals involved in prostitution. Yates argues that, because Everson had never been a prostitute herself or accompanied a prostitute on a job, the trial court erred in finding her qualified under ER 702. But an expert need not have acquired his or her knowledge through such personal involvement. *See State v. Campbell*, 78 Wn. App. 813, 823, 901 P.2d 1050 (1995) (permitting police officers to testify as experts on gang culture, even though they were not " 'from the same neighborhood, city or county' " as the gang members). As this court stated in *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992), "[p]ractical experience is sufficient to qualify a witness as an expert." Here, the trial court properly concluded that Everson's practical experience qualified her as an expert.

¶63 Yates's second argument is that Everson's testimony constituted improper "habit" evidence under ER 406.[25] As the State points out, Everson's testimony was admitted under ER 702, not ER 406. The trial court ruled that Everson could testify as an expert as to the general practices of prostitutes but could not testify as to the habits of specific victims—i.e., as to what the victims "always" or "never" did. *See* 50 VRP at 4398, 4408-09, 4412. Everson thus testified, based upon her experience, about the general practices of prostitutes. She testified that prostitutes generally used drugs and alcohol, asked for payment up front, chose where the negotiated sex act would occur, commonly engaged in oral and vaginal sex, and avoided anal intercourse because it made them more vulnerable. Similar expert testimony has been deemed permissible under ER 702. For example, in *State v. Simon*, 64 Wn. App. 948, 963, 831 P.2d 139 (1991), *rev'd in part on other grounds*, 120 Wn.2d 196, 840 P.2d 172 (1992), a detective who "testified that he had been involved in investigating street prostitu-

---

[25] "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." ER 406.

tion for over 6 years, that he had investigated over 400 prostitution related crimes, and that he had investigated over 50 promoting prostitution cases," offered testimony "about his contact and conversations with prostitutes regarding the pimp/prostitute relationship."

¶64 Even if the admission of Everson's testimony were regarded as an abuse of discretion, the error was harmless. *See Bourgeois*, 133 Wn.2d at 403. Other witnesses testified that prostitutes generally asked for payment up front, and the crime scene evidence regarding the victims' missing items supported the State's theory that Yates robbed Mercer and Ellis. Everson's testimony was properly admitted under ER 702.

c. Defense's Requested Funding for Expert

¶65 Yates also contends that the trial court erred by withholding funding for a defense expert on prostitution. CrR 3.1(f) governs the appointment of a defense expert at public expense:

> (1) A lawyer for a defendant who is *financially unable* to obtain investigative, expert, or other services *necessary to an adequate defense* in the case may request them by a motion to the court.
>
> (2) Upon finding the services are *necessary* and that the defendant is *financially unable* to obtain them, the court . . . shall authorize the services.

(Emphasis added.) As this court stated in *State v. Young*, 125 Wn.2d 688, 691, 888 P.2d 142 (1995), "[w]hether expert services are necessary for an indigent defendant's adequate defense lies within the sound discretion of the trial court and shall not be overturned absent a clear showing of substantial prejudice."

¶66 Yates failed to demonstrate that his proposed expert was "necessary to an adequate defense." CrR 3.1(f)(1). After the State notified the defense of its intention to call Everson as an expert on the practices of women engaged in prosti-

tution, the defense brought an ex parte motion under CrR 3.1(f), requesting funds for its own expert on prostitution. Defense counsel stated that the defense "wanted Mr. Parker . . . to give [his] insight into women's behavior that are working on the street." 16 VRP at 852. Counsel explained that "it relates to the aggravator primarily of robbery, and it addresses whether or not women typically carry purses, carry money, those kinds of things." *Id.* Responding to a question from the court, counsel stated that she did not believe that "there [was] a lot of difference in opinion in general about . . . how these women operate," and she acknowledged that she had "already disclosed to [the State] that [Mr. Parker's] testimony would be similar to" the testimony of the State's expert. *Id.* at 853, 854-55. Expressing a desire to have "more information" regarding the special contributions that the defense's proposed expert would make, the court entered an order stating that the defense's funding request was "[d]enied at this time subject to further hearing or information." 16 VRP at 854-55; CP at 2511. The record is devoid of any further information that the defense provided concerning the anticipated testimony of its proposed expert on prostitution. Absent any evidence that his proposed expert would have provided "services necessary to an adequate defense," CrR 3.1(f)(1), Yates cannot meet his burden of showing that the trial court abused its discretion and substantially prejudiced his defense. *Young*, 125 Wn.2d at 691.

¶67 The trial court did not abuse its discretion by admitting the expert testimony of Safarik and Everson under ER 702 and by denying the defense's motion under CrR 3.1(f) for public funds to retain its proposed expert on prostitution.

¶68 8. *Admission of Photographic Evidence.* Yates argues that the trial court improperly admitted three autopsy photographs, the "in-life" photographs of the Spokane victims, and photographs of certain possessions of two Spokane victims.

a. Autopsy Photographs

¶69 Autopsy photographs are admissible if they are "[a]ccurate," and "if their probative value outweighs their prejudicial effect." *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983); ER 403. Autopsy photographs have probative value when "they are used to illustrate or explain the testimony of the pathologist performing the autopsy." *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856 (1992). A trial court's admission of autopsy photographs is reviewed for an abuse of discretion. *Crenshaw*, 98 Wn.2d at 806.

¶70 Yates challenges the trial court's admission of exhibit 325, a photograph showing the medical examiner's incisions in the arm of Spokane victim Darla Scott. The incisions revealed subcutaneous puncture marks, demonstrating that Scott had been an intravenous drug user. The evidence was relevant to the State's theory that, as an element of Yates's overarching plan, he selected women with serious drug addictions. Because Everson had simply testified that Scott had an "issue" with street drugs and State's witness Michael Mitchell had similarly speculated that Scott "was hooked on crack cocaine," the medical examiner's evidence of Scott's intravenous drug use was relevant and was not cumulative. 50 VRP at 4452; 52 VRP at 4868.

¶71 Yates likewise argues that exhibit 444, a photograph showing the medical examiner's incision in Ellis's leg, was improperly admitted. However, because Ellis's body was "extensively decomposed and skeletonized," the photograph offered essential evidence that blood and muscle were available from which viable DNA material could be extracted. 26 VRP at 1483; 58 VRP at 5907. The DNA extracted from Ellis's remains matched blood found in Yates's Ford van and thus supplied a critical piece of evidence identifying Yates as Ellis's killer.

¶72 The third autopsy photograph that Yates has challenged, exhibit 604, shows that the innermost plastic bags

tied around Mercer's head were perforated and drawn partially into her mouth. The photograph provided circumstantial evidence that Mercer was alive when Yates encased her head in four plastic grocery bags. The circumstantial evidence was relevant to, and probative of, Yates's premeditated intent to kill Mercer. Yates arguably tied plastic bags over his victims' heads not only to minimize blood evidence in his vehicles but also to ensure that his victims died from the wounds inflicted with his small caliber handguns.

¶73 The trial court did not abuse its discretion by admitting the three challenged autopsy photographs. Their "probative value" outweighed the "danger of unfair prejudice." ER 403.

b. "In-Life" Photographs of Spokane County Victims

¶74 Yates contends that the trial court erred by admitting "in-life" photographs of the Spokane County victims. Following a pretrial hearing on the admissibility of the photographs, the trial court reserved its final ruling in order to review their relevance to the "common scheme or plan" aggravator and to afford the parties further opportunity to brief the issue. No further briefing was provided, and at trial all but 2 of the 10 photographs were admitted without a defense objection. The State concedes that the defense arguably preserved an objection to the "in-life" photographs of Oster and Derning.

¶75 In prior decisions, we have recognized that, because the State bears the burden of proving a victim's identity, the trial court's admission of "in-life" photographs of the victim was not an abuse of discretion. In *Pirtle*, we held that "in-life" photographs of the victims were relevant to prove identity[26] and that, under the required balancing of ER 403, the "probative value" of the photographs was not "outweighed by unfair prejudice." 127 Wn.2d at 651-53. In

[26] " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

considering the potential prejudice of the "in-life" photos, the *Pirtle* court compared such photographs to the more graphic postmortem photographs placed before the jury: "The autopsy photos, however, are clearly more prejudicial than the 'in-life' photos. In light of the gruesome photos of the victims that were also before the jury, it cannot be said that the 'in-life' photos could have added much additional prejudice." *Id.* at 653 (citing *State v. Furman*, 122 Wn.2d 440, 452, 858 P.2d 1092 (1993) (observing that " '[i]n life' pictures are not inherently prejudicial, particularly where as here the jury has seen 'after death' pictures of the victim's body")).

¶76 Here, we must ask the same two questions that the *Pirtle* court asked—whether the "in-life" photographs are relevant under ER 401 and, if so, whether they are more probative than prejudicial under ER 403. We conclude, as did the *Pirtle* court, that the trial court's admission of the "in-life" photographs of the Spokane victims was not an abuse of discretion. For purposes of the admissibility inquiry, the fact that the photographs here are those of the Spokane victims and not of Mercer and Ellis is a distinction without a difference, given that the trial court's admission of evidence of the Spokane crimes under ER 404(b) has not been challenged. As to the relevance of the "in-life" photographs, the State argues that they were relevant to prove an element of Yates's overarching plan to murder women who were generally similar in appearance. Yates's victims were white or light-skinned women with dark hair—"none of the women were blond," and "[n]one of the women were African-Americans." 65 VRP at 6952. The State maintains that, in addition to demonstrating an element of the common plan, "the in-life photographs . . . assisted the jury in processing what would otherwise appear to be repetitive testimony by attaching a face to the discovery and autopsy of each of the many bodies." Br. of Resp't at 154. For example, in addition to the "in-life" photograph of victim Oster, the State introduced (without objection at trial or challenge on appeal) a photograph of the recovery site of

Oster's body, three photographs of her body at that site, and eight autopsy photographs (including photographs of the plastic bags from Oster's head, a close-up of bullet holes, and a "Defect in Skin"). CP at 4462-63 (listing Exs. 355-63, 365-67). Similarly, along with the "in-life" photograph of Derning, the trial court admitted the State's proffered photographs (without a defense objection) of the recovery site of Derning's body, her body at that site, and "Defects to Head." *Id.* at 4465 (listing Exs. 423-26, 428-30). Applying the *Pirtle* court's reasoning, this court cannot conclude that the challenged "in-life" photographs of Oster and Derning "could have added much additional prejudice," in light of the graphic "after death" photographs that were admitted without objection. 127 Wn.2d at 653.

¶77 The admission of the "in-life" photographs of Oster and Derning was not an abuse of discretion. The photographs were relevant to the State's proof of a "common scheme or plan" and assisted the jury in assimilating the evidence. Under the *Pirtle* court's ER 403 analysis, due to the admission of more graphic postmortem photographs, the potential "unfair prejudice" arising from the "in-life" photographs would be minimal and would not outweigh their "probative value."[27]

c. Photographs of Victims' Possessions

¶78 Yates argues that the trial court improperly admitted exhibit 339, a photograph of victim Shawn Johnson's car. The car was recovered from the East Sprague corridor, but the photograph was taken at the police vehicle processing station. The State explains that, on the night of Johnson's disappearance, she told her roommate that she was going out to make some money through prostitution; thus, the photograph of the car "established that she did *in fact* have a car, and therefore had a ready means to arrive

[27] Even if we were to conclude that the defense had properly preserved an objection to the "in-life" photographs of the other eight Spokane victims, the same analysis would apply, requiring the same result.

at her destination." Br. of Resp't at 156. The relevance of the photograph is marginal at best, but it is difficult to imagine how the photograph of Johnson's car could have been more than marginally prejudicial, in light of the many other photographs admitted as evidence of Yates's murder of Johnson. CP at 4461-62 (listing Exs. 327-38 (including such photographs as "Close-up of Body," "Close-up of Victim's Head," "Close-up of Knots in Plastic Bag")).

¶79 Yates also claims that the trial court abused its discretion by admitting photographs of a jacket found in Yates's house. The Mickey Mouse jacket belonged to Christine Smith, the woman whom Yates attempted to murder but who managed to escape after being shot in the head while performing oral sex on Yates in the back of his van. Two photographs show the jacket hanging in the closet, and the third and fourth photographs are of the front and back of the jacket. While Yates is technically correct that Smith left the jacket behind after he shot her, the photographs support the State's position that Yates kept Smith's property, an action consistent with his alleged robbery of his murder victims. The trial court did not abuse its discretion in admitting the photographs of Smith's jacket hanging in Yates's closet.

¶80 We find no abuse of discretion in the trial court's admission of the three contested autopsy photographs, the "in-life" photographs of the Spokane victims, and the photographs of Smith's jacket.

¶81 9. *Summary Chart of Evidence.* This court has recognized that "[t]he use of demonstrative or illustrative evidence is to be favored." *Lord*, 117 Wn.2d at 855. A chart summarizing the evidence—especially where the evidence is complex and established by multiple witnesses—can appropriately assist the jury. *Id.* While the trial court has "wide latitude in determining whether or not to admit demonstrative evidence," "the court must make certain that the summary is based upon, and fairly represents, competent evidence already before the jury." *Id.* The court ensures that the prosecution's summary chart is "substantially

accurate . . . by allowing the defense full opportunity to object to any portions of the summary chart before it is seen by the jury." *Id.* at 856. Additionally, to guard against "the possibility that the jury will treat the summary as additional evidence," the trial court must instruct the jury "that the chart is not itself evidence, but is only an aid in evaluating the evidence." *Id.*

¶82 Yates argues that the trial court improperly permitted the State to use exhibit 544, a large summary chart of the State's evidence regarding the Spokane County and Pierce County crimes. The chart, approximately 7½ feet by 13 feet, listed the names of the 13 victims horizontally across the top, with 15 categories of evidence listed vertically down the left side.[28] During the course of the State's case, information regarding the evidence was posted on the chart after the evidence was presented. Before the additions were revealed to the jury, the trial court permitted the defense to contest the accuracy of the new information. Additionally, the court repeatedly instructed the jury that the chart itself was not evidence, and the chart did not go to the jury room during deliberations.

¶83 Yates does not assert that the trial court failed to apply the safeguards set forth in *Lord*, but he claims that the chart was nonetheless inaccurate in three particulars. First, he contends that, because one of the evidence categories was "Cause of Death," the chart should not have listed among the victims across the top of the chart Christine Smith, the woman who survived after Yates shot her in the head. However, as the State points out, the notation entered under Smith's column was "Gunshot wound to head

[28] The categories were "(1) the date the victim was last seen, and the date the body was recovered, (2) the victim's gender, (3) whether the victim had a history of prostitution and/or drugs, (4) the cause of death, (5) the bullet(s)/gun type, (6) whether Yates owned this type of weapon, (7) Yates's method of contacting the victim, (8) whether plastic bags were found, (9) whether money was present or absent at the scene, (10) whether semen was found in the body, (11) whether the victim was transported, (12) whether the victim's body was immediately found, (13) whether the victim's clothing was removed/missing, (14) whether the victim's blood was found on Yates's property, (15) whether Yates pleaded guilty to the victim's premeditated murder." Br. of Resp't at 159.

(survived)." Ex. 544. Moreover, because the State called Smith as a witness at trial, the defense cannot rationally claim that the chart could have misled the jury into thinking that Yates had succeeded in killing Smith as well. Second, Yates claims it was misleading to enter "yes" in the "Clothing Removed/Missing" category for victim Zielinski. The State's evidence established that Zielinski's body was found clothed only in a short one-piece dress pulled up to her upper torso area, with her socks, panty hose, and a boot found a short distance away. Third, Yates argues that the "yes" entered in the same category for Mercer was also inaccurate, but here again, the record supports the notation. Mercer's body was found nude dumped in some blackberry bushes, and while some of her clothing had been thrown on top of her body, her brassiere, tank top, and shoes were missing.

¶84 Yates has failed to show that the chart was not "substantially accurate." *Lord,* 117 Wn.2d at 856. The trial court did not abuse its discretion by permitting the State to use exhibit 544, the summary chart of evidence.

¶85 10. *Prosecutorial Misconduct.* Yates claims that the prosecutor made several improper remarks during questioning and closing argument in the guilt phase, as well as during closing argument in the penalty phase. To prevail on his claim of prosecutorial misconduct, Yates bears the burden of proving, first, that the prosecutor's comments were improper and, second, that the comments were prejudicial. *State v. McKenzie,* 157 Wn.2d 44, 52, 134 P.3d 221 (2006). A prosecutor's improper comments are prejudicial "only where 'there is a *substantial likelihood* the misconduct affected the jury's verdict.'" *Id.* (quoting *Brown,* 132 Wn.2d at 561). A reviewing court does not assess "[t]he prejudicial effect of a prosecutor's improper comments . . . by looking at the comments in isolation but by placing the remarks 'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *Id.* (quoting *Brown,* 132 Wn.2d at 561).

a. Allegations of Misconduct in Guilt Phase

¶86 Yates first complains that the prosecutor committed misconduct by questioning witness Scott Carlson, the purchaser of Yates's Ford van, about Yates's ownership of guns and his interest in target shooting. Carlson testified that he and Yates "discuss[ed] a mutual hobby of target shooting" and that Yates said he had taught his daughters "how to shoot a .22 because that's a quite easy gun for young people." 58 VRP at 5884-85, 5889-93. Yates seems to argue that, by questioning Carlson about Yates's enjoyment of target shooting and his use of the .22 caliber firearm, the prosecutor was improperly commenting on Yates's constitutional right to possess a legal firearm. The argument is meritless. As stated in *State v. Hancock*, 109 Wn.2d 760, 767-68, 748 P.2d 611 (1988), "[w]here a defendant's ownership of a gun is relevant to an issue at stake in the trial, we recognize no special rule that would prevent that evidence from being admitted." Here, the trial court determined that Yates's ownership of a .22 caliber handgun was relevant and admissible, and the defense has not challenged that evidentiary ruling. The prosecutor's questioning of Carlson was not improper.

¶87 Yates next contends that the prosecutor made an improper, prejudicial comment during cross-examination of defense witness Danielle Gorder, a woman who worked as a prostitute in Spokane. On direct examination, Gorder testified that Yates had used her services four to seven times in 1999 and that he was a "good date" who paid well. 66 VRP at 7067, 7071. The following exchange occurred on cross-examination:

Q   And your gut feeling was that that man over there, Robert Yates, was a good guy to go with?

A   Yeah.

Q   And you went with him?

A   Yes, ma'am, I did.

Q    You are lucky to be alive, aren't you?

*Id.* at 7093. Defense counsel objected immediately, asking the court to strike the comment as "argumentative," and the court responded: "That question and response will be stricken from the record, counsel." *Id.* The defense requested a mistrial, but after taking the matter under advisement, the court denied the motion, concluding that its instruction had cured the improper remark.

        ¶88 We find no error in the trial court's determination that the prosecutor's remark was improper though not prejudicial. The improper remark was promptly and clearly "stricken from the record," and the court later instructed the jurors that they must "disregard any evidence . . . that was stricken by the court." CP at 4086 (Jury Instruction 1). Moreover, to declare the improper remark prejudicial, we would have to conclude that "there [was] a substantial likelihood the misconduct affected the jury's verdict." *Brown*, 132 Wn.2d at 561. When measured against the overwhelming evidence in the case and, in particular, defense counsel's concession in opening statement that Yates had killed a number of women working in prostitution, the prosecutor's remark likely had little or no effect on the jury's verdict.

        ¶89 Yates contends that the prosecutor made two improper, prejudicial comments in rebuttal closing argument. First, Yates maintains that in the following remarks the prosecutor misstated the law regarding the crime of robbery:

> And it can be done with—even though it's without their knowledge, provided the force prevented them from knowing it.
>
> One way to do that is if a person goes into a market and pulls what appears to be a gun on the clerk[,] scares the dickens out of them and they run away and then the robber helps themselves to the till, well, that's still robbery, even though the person who ran didn't know that they actually took the money. It's still robbery.

So, too, you can rob someone you just murdered. You prevented their knowledge of it by killing them, and it's still robbery.

70 VRP at 7576-77. Defense counsel "object[ed] to the last statement that you can—robbery is just taking from the dead." *Id.* at 7577. Overruling the objection, the trial court stated that it had "instructed the jury on the law" and that "[t]his is argument." *Id.* We likewise conclude that the remark was not improper. The prosecutor's argument comported with jury instruction 15, which provided, in part, that "[t]he taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom it was taken, such knowledge was prevented by the use of force or fear." CP at 4101; *see also State v. Craig*, 82 Wn.2d 777, 782-83, 514 P.2d 151 (1973).

¶90 Yates also argues that, at the end of rebuttal closing argument, the prosecutor committed misconduct by disparaging defense counsel:

> The lawyers have had their say, and now you'll have your say. We thank you for your patience during this lengthy trial. On behalf of all of the decent and law-abiding citizens of the state whom we are honored to represent—
>
> . . . .
>
> . . . we thank you for your service. And on our behalf, we now ask you please return verdicts of guilty as charged. Thank you.

70 VRP at 7587-88. Defense counsel interposed an objection, but the trial court permitted the prosecutor to complete the remark. Defense counsel moved immediately for a mistrial or a curative instruction, but finding in the remarks no adverse implication about the defense attorneys, the court ruled that neither a mistrial nor a curative instruction was warranted.

¶91 Yates's reliance on *State v. Gonzales*, 111 Wn. App. 276, 45 P.3d 205 (2002), *review denied*, 148 Wn.2d 1012 (2003), is unpersuasive. There, the court held that the prosecutor disparaged defense counsel by drawing the

following sharp contrast: " 'I have a very different job than the defense attorney. I do not have a client, and I do not have a responsibility to convict. I have an oath and an obligation to see that justice is served.' " *Id.* at 283. Unlike the prosecutor in *Gonzales*, the prosecutor in the present case did not refer to defense counsel's role and drew no direct contrast between the roles of prosecutors and defense attorneys. Here, the trial court reasonably determined that the remark was not improper. Even if we were to declare the comment improper, the criticism of defense counsel was far too attenuated to have been prejudicial; little likelihood—certainly not a "substantial likelihood"—exists that the comment "affected the jury's verdict." *Brown*, 132 Wn.2d at 561.

b. Allegations of Prosecutorial Misconduct in Penalty Phase

¶92 Yates claims that the prosecutor committed misconduct in argument during the penalty phase. The prosecutor attacked the sincerity of Yates's religious conversion, a conversion that was the centerpiece of Yates's allocution. Observing that Yates's "claimed conversion occurred after his arrest,"[29] the prosecutor went on to question whether Yates's "remorse" had actually even "show[n] up after his arrest." 77 VRP at 8222-23. In particular, the prosecutor argued that, had Yates been truly remorseful, he would not have withheld the location of Melody Murfin's body "until the eve of his guilty plea in Spokane." *Id.* at 8223. The prosecutor argued that, in the course of talking with police, pastors, and his father or in the course of writing "many, many letters," he would have "offer[ed] up details of what he did": "If he is remorseful, ladies and gentlemen, where are the guns that he used to kill his victims?" *Id.* at 8224-26.

---

[29] "Until God's spirit working through the human agencies of law enforcement and our justice system woke me out of my spiritual blindness, I couldn't see the enormous devastation I had created, the tremendous pain and suffering I had caused." 77 VRP at 8197-98.

¶93 Specifically, Yates claims that in the following remarks the prosecutor improperly commented on Yates's Sixth Amendment right to counsel: "Now, you've heard from . . . one of his pastors that he might have revealed this information [the location of Murfin's body] to his lawyers. The defendant said as much to you. That does not absolve him of the despicable decision . . . to hold onto that information until such time as it might work to his advantage. . . . Her location was not revealed until . . . six months after his arrest. Is that remorse on his part? Can he pass that off to his lawyers? No, he cannot." *Id.* at 8223-24. Yates does not explain how the jury could have construed the remarks as an implication that, because he had counsel, he was guilty, a fact not at issue in the penalty phase. When placed in the context of the prosecutor's general attack on the believability of Yates's conversion and remorse, the clear point of the prosecutor's comment was that, if, as Yates claimed, he had "c[o]me back to the love of God in Jesus Christ," *id.* at 8198, he would not have made Murfin's family wait six months to reclaim her remains from his yard. The remark was not an improper comment on Yates's right to counsel.

¶94 Second, Yates contends that, by criticizing his refusal to reveal further information about his crimes, the prosecutor was improperly commenting on his Fifth Amendment right to remain silent. However, as this court held in *State v. Clark*, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001), "[w]hen a defendant does not remain silent and instead talks to police, the state may comment on what he does *not* say." Here, in closing argument in the penalty phase, the prosecutor repeatedly directed the jury's attention to the claims made by Yates in his allocution, and the prosecutor juxtaposed Yates's statements of remorse and sympathy with "what he [did] *not* say." *Id.* The unmistakable intent of the prosecutor's comments was to undermine the mitigation evidence that Yates provided in his allocution. The prosecutor did not improperly comment on Yates's right to remain silent. *See State v. Jeffries*, 105 Wn.2d 398, 415-16, 717 P.2d 722 (1986).

¶95 Yates also claims that the prosecutor improperly denigrated defense counsel by suggesting to jurors that the defense was "playing the religion card." 77 VRP at 8230-31. The prosecutor argued that "the defense wants [you to] believe that Mr. Yates is a Christian person," and "[t]hey want [you to] think that the Almighty has forgiven the defendant and that any decent Christian person ought to likewise forgive him and show mercy." *Id.* at 8230. The prosecutor urged the jury to abide by their "oath to follow the law" and to resist the "shameful . . . attempt to play upon spiritual beliefs." *Id.* at 8231. The trial court overruled the defense's objection to the prosecutor's argument and later explained that, while the remarks "may be pushing the line somewhat," they did not amount to "personal attacks regarding the ethics or integrity of defense counsel." *Id.* at 8248-49. Because Yates made his Christian commitment the cornerstone of his mitigation evidence, the trial court reasonably accorded the prosecutor some latitude to argue that the defense was attempting to appeal to the jurors' own religious beliefs.

¶96 Finally, Yates argues that the following comment made in the prosecutor's rebuttal closing argument was improper and prejudicial:

> He was sentenced for the Spokane murders two years ago, 1998. . . . Assume that he lives 50 years beyond the time he was sentenced in 2000, so he lives to be 98 years old. In Spokane, he was sentenced for 13 murders and one attempted murder. Divide that number, 14 into 50. That's a little over three years for each murder. Is human life that cheap?

*Id.* at 8300. The defense immediately objected, and the trial court sustained the objection: "Sustained. That's improper argument. Jury is to disregard that argument." *Id.* Yates argues on appeal that the prosecutor's improper remark was "designed to appeal to the passion and prejudice of the jury." Br. of Appellant at 197. We conclude that the trial court's unequivocal response to defense counsel's objection cured the improper remark. *See Grisby*, 97 Wn.2d at 499 (noting that "[t]he jury is presumed to follow the instruc-

tions of the court"). In any case, when the prosecutor's improper remarks are placed in the context of the entire special sentencing proceeding, it cannot be said that there was a "substantial likelihood the misconduct affected the jury's verdict." *Brown*, 132 Wn.2d at 561; *see* CP at 4481; RCW 10.95.060(4).

¶97 In sum, Yates has failed to show that the prosecutor committed misconduct in the guilt or penalty phases. Of the comments that the defense challenges, only the prosecutor's rhetorical question to defense witness Danielle Gorder—"You are lucky to be alive, aren't you?" 66 VRP at 7093—was clearly improper, but that remark's prejudicial effect, assessed in the context of the evidence in the case, is negligible.

¶98 11. *Concurrent Sentences for Pierce County and Spokane County Crimes*. Yates argues that the trial court erred in ordering him to serve the sentence imposed in the Pierce County case concurrently with the 408-year sentence imposed for the Spokane County convictions. Yates rests his argument on a provision in the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. The State argues that, *if* the SRA sentencing procedures apply to capital sentencing proceedings, Yates is relying on the wrong subsection of RCW 9.94A.589(1).

¶99 Yates contends that under RCW 9.94A.589, his sentence for the Pierce County crimes should run consecutively to his Spokane County sentence:

> (1)(a) Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced *for two or more current offenses*, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. *Sentences imposed under this subsection shall be served concurrently*. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535.

> "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim. This definition applies in cases involving vehicular assault or vehicular homicide even if the victims occupied the same vehicle.
>
> (b) Whenever a person is convicted of two or more serious violent offenses arising from separate and distinct criminal conduct, the standard sentence range for the offense with the highest seriousness level under RCW 9.94A.515 shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score and the standard sentence range for other serious violent offenses shall be determined by using an offender score of zero. The standard sentence range for any offenses that are not serious violent offenses shall be determined according to (a) of this subsection. *All sentences imposed under (b) of this subsection shall be served consecutively to each other* and concurrently with sentences imposed under (a) of this subsection.

(Emphasis added.) Subsection (1)(a) explains how "a person is to be sentenced for two or more current offenses"—offenses for which offender scores are "being computed" "on the same date." RCW 9.94A.525(1). The general rule, as expressed in subsection (1)(a), is that, where a person is being sentenced on multiple counts on the same day, the sentences for those "current offenses" are to run concurrently with one another. Yates relies on RCW 9.94A-.589(1)(b), an exception to subsection (1)(a). Subsection (1)(b) describes how the offender score is to be computed for a person whose multiple current offenses are "serious violent offenses." Subsection (1)(b) requires the court to impose consecutive sentences for those current offenses that are "serious violent offenses." RCW 9.94A.589(1)(b) is inapplicable to Yates's sentencing proceeding in Pierce County. Plainly, his Pierce County and Spokane County convictions are not "current offenses" within the meaning of these SRA provisions.

¶100 The State argues (and the sentencing court agreed) that, *if* any SRA provisions are to apply to Yates's sentenc-

ing in Pierce County, the only provision that could apply is RCW 9.94A.589(3). While subsection (1) governs the calculation of an offender score for "current offenses" (again, those for which convictions are entered or sentences are imposed on the same date), subsections (2) and (3) define how the court is to sentence a person for a felony when that person is already under sentence for a different felony. Subsection (2)(a) requires that, where "a person while under sentence for conviction of a felony commits another felony," the sentence for the second felony must run consecutively to the preexisting felony sentence. Because Yates did not commit the Pierce County felonies while under sentence for the Spokane County crimes, subsection (2) does not apply to Yates.

¶101 Under the State's theory, however, subsection (3) does fit Yates's situation:

> [w]henever a person is sentenced for *a felony that was committed while the person was not under sentence for conviction of a felony*, the sentence shall run concurrently with any felony sentence which has been imposed by any court in this or another state or by a federal court subsequent to the commission of the crime being sentenced unless the court pronouncing the current sentence expressly orders that they be served consecutively.

RCW 9.94A.589(3) (emphasis added). Yates was being sentenced in Pierce County for crimes that were "committed while [he] was *not* under sentence for conviction of" the Spokane County crimes. *Id.* (emphasis added). If this provision applies, then it requires that the Pierce County sentence run concurrently with the Spokane County sentence "unless the court pronouncing the current [i.e., Pierce County] sentence expressly orders that they be served consecutively." Here, the court concluded that, under RCW 9.94A.589(3), Yates's Pierce County sentence could run concurrently with the Spokane County sentence.

¶102 We reject Yates's argument that RCW 9.94A-.589(1)(b) mandates consecutive Spokane County and Pierce County sentences. We reach this conclusion because the

SRA provisions on concurrent and consecutive sentences (RCW 9.94A.589) cannot be sensibly applied when a jury in a special sentencing proceeding under chapter 10.95 RCW returns a verdict for a death sentence. The oddity underlying this sentencing issue is that, here, we have a *defendant* seeking a *consecutive* sentence, while the *State* argues for *concurrent* sentencing. Paradoxically, Yates seeks a more lenient punishment by invoking a provision intended to ensure a harsher sentence. Whereas RCW 9.94A.589(1)(b) requires those convicted of multiple "serious violent offenses" to serve a harsher sentence (consecutive terms) on those counts, Yates relies on that provision to lessen the severity of his sentence, effectively commuting his death sentence to life. Similarly, the State seeks the harsher sentence of death by relying on a provision that was intended to make the more lenient sentence the default. RCW 9.94A.589(3) makes the less harsh sentence (concurrent terms) the standard and permits the harsher sentence (consecutive terms) only as an exception that the sentencing court must "expressly order[ ]." RCW 9.94A.589(3). In sum, both the defense and the State ignore that they are relying on provisions that were intended to have effects opposite to the ones they desire. Clearly, it is the uniqueness of the death penalty that skews the positions the defense and the State have taken on this sentencing issue. Accordingly, we reject the application of the SRA provisions on concurrent and consecutive sentences to the imposition of the death penalty.

¶103 Thus, we conclude that the trial court did not err in requiring that the Pierce County sentence be served concurrently with the Spokane County sentence.

B. *Mandatory Death Sentence Review and Related Issues Raised by Defendant*

¶104 RCW 10.95.100 requires this court to review every death sentence entered in this state. In the course of its mandatory review (consolidated with the defendant's appeal, if any), this court must make the following determinations:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . ;

(c) Whether the sentence of death was brought about through passion or prejudice; and

(d) Whether the defendant was mentally retarded within the meaning of RCW 10.95.030(2).

RCW 10.95.130(2). Because Yates made no claim that he was mentally retarded, the inquiry required in subsection (d) is inapplicable. Yates provided no argument regarding subsection (a) and made only minimal comment on subsection (c), but he raised a number of now familiar issues related to the proportionality review of subsection (b).

¶105 1. *Insufficiency of Mitigating Circumstances To Merit Leniency*. At Yates's special sentencing proceeding, the court instructed the jury that "the State has the burden of proving . . . beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency." CP at 4444 (Jury Instruction 3 (Special Sentencing Hr'g)). The court defined "mitigating circumstance" for the jury as "a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense." *Id.* at 4446 (Jury Instruction 5 (Special Sentencing Hr'g)). Of the eight nonexclusive statutory factors that a jury may consider as mitigating circumstances, only one was specifically mentioned in jury instruction 5: "Whether there is a likelihood that the defendant will pose a danger to others in the future." *Id.*; RCW 10.95.070(8). The jury was instructed that it would receive "a sentencing verdict form" on which it would be required to record its answer to one yes/no question:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that

there are not sufficient mitigating circumstances to merit leniency?

CP at 4448, 4445 (Jury Instructions 7, 4 (Special Sentencing Hr'g)); RCW 10.95.060(4). The instruction stated that an affirmative response would result in a death sentence, and the sentencing verdict form included a similar explanatory note under the word "YES": "In which case the defendant shall be sentenced to death." CP at 4445, 4481. The jury at Yates's special sentencing proceeding unanimously answered "YES." *Id.* at 4481.

¶106 RCW 10.95.130(2)(a) requires this court to determine whether the evidence was *sufficient* to convince the jury beyond a reasonable doubt that the mitigating circumstances were *insufficient* to warrant leniency. To make that determination, this court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt." *Brown*, 132 Wn.2d at 551. This court has held that "[t]he mere presence of mitigating factors does not require that the jury grant leniency"; rather, if a jury is "convinced that the circumstances of the crime outweigh the mitigating factors," it may rationally conclude that leniency is not merited. *State v. Dodd*, 120 Wn.2d 1, 25, 838 P.2d 86 (1992).

¶107 Viewing the evidence in the light most favorable to the State, we conclude that the Yates jury could have rationally found the mitigating circumstances insufficient to justify a grant of leniency. Yates's mitigation evidence consisted of the testimony of family members, friends, and former high school teachers and coaches. Correctional officers from the Spokane County and Pierce County jails testified regarding Yates's behavior in custody, and the jury also heard testimony from pastors and fellow inmates familiar with Yates's postarrest religiosity. Additionally, in his allocution, Yates apologized to the victims' families and described his religious conversion. The State presented additional evidence of Yates's criminal history, informing

the jurors that Yates murdered Patrick Oliver and Susan Savage in 1975 and Stacy Hahn in 1988. The State also elicited testimony from relatives of Mercer and Ellis. The jurors could have reasonably been persuaded, as the State argued in rebuttal closing argument, that no leniency was merited for one whose upbringing had been "idyllic" but who had nevertheless killed 15 people and tried to kill a 16th. 77 VRP at 8292. The jurors may well have shared the State's viewpoint that Yates's postarrest conversion was self-serving and his allocution offensively self-indulgent. *Id.* at 8296-97.

¶108 We hold that "there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4)." RCW 10.95.130(2)(a). A rational jury could have been convinced beyond a reasonable doubt "that the circumstances of the crime[s] outweigh[ed] the mitigating factors." *Dodd*, 120 Wn.2d at 25.

¶109 2. *Passion or Prejudice.* RCW 10.95.130(2)(c) requires this court to determine "[w]hether the sentence of death was brought about through passion or prejudice." Yates contends that his previously discussed allegations of prosecutorial misconduct constituted an effort on the State's part to secure a death sentence "based upon passion and prejudice." Br. of Appellant at 205-06; *see supra* issue A.10. But as the State points out, among Yates's allegations of prosecutorial misconduct in the penalty phase, only one was characterized as "an improper appeal to passion and prejudice." Br. of Resp't at 230. The court sustained the objection to that remark and instructed the jury to disregard it. 77 VRP at 8300. The claims of prosecutorial misconduct do not support the conclusion that the jury's verdict in the penalty phase was the product of "passion or prejudice." We presume, in the absence of evidence to the contrary, that the jury heeded the trial court's explicit instructions: "You should bear in mind that your verdict must be based upon reason and not upon emotion. Throughout your deliberations you must not be influenced by passion, prejudice or sympathy." CP at 4442 (Jury Instruction 1 (Special Sentencing Hr'g)); *Grisby*, 97 Wn.2d at 509.

¶110 We conclude that the jury's verdict in the special sentencing proceeding was not "brought about through passion or prejudice." RCW 10.95.130(2)(c).

¶111 3. *Proportionality.* In its mandatory review of each case in which the death penalty is imposed, this court must determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in *similar cases*, considering both the crime and the defendant." RCW 10.95.130(2)(b) (emphasis added). By "similar cases,"[30] the subsection means "other death eligible cases." *State v. Cross*, 156 Wn.2d 580, 630, 132 P.3d 80, *cert. denied*, 127 S. Ct. 559 (2006); *Davis*, 141 Wn.2d at 880. To conduct the statutory proportionality review, this court has "adhered closely to the statutory directive to consider 'both the crime and the defendant' " and has thus "subdivided the crime and the defendant into four factors." *Pirtle*, 127 Wn.2d at 686. The court looks at the nature of the defendant's crime, the aggravating circumstances proved at trial, the defendant's prior convictions, and the defendant's personal history. *Id.*; *Cross*, 156 Wn.2d at 630-31. When this court engages in its statutory proportionality review, the court's "touchstone is whether the penalty in a particular case is freakish and wanton or given for a forbidden reason." *Cross*, 156 Wn.2d at 632.

a. Consideration of Crime and Defendant

¶112 In the *Cross* opinion, which was filed just one year ago, this court followed the customary four-factor approach and concluded that Cross's death sentence was not "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95-.130(2)(b). Consistent with the *Cross* court's analysis, this court likewise concludes that Yates's death sentence for

---

[30] "For the purposes of this subsection, 'similar cases' means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." RCW 10.95.130(2)(b).

the murders of Mercer and Ellis was not disproportionate under RCW 10.95.130(2)(b).

¶113 Regarding the first factor, the nature of the crime giving rise to the death sentence, Yates's crimes were similar to Cross's. First, while Cross murdered three women (his wife and two of her daughters), Yates murdered two, and as the *Cross* court pointed out, death sentences have previously been handed down in cases with fewer than three victims. 156 Wn.2d at 632 (citing *State v. Woods*, 143 Wn.2d 561, 616, 23 P.3d 1046 (2001); *State v. Stenson*, 132 Wn.2d 668, 759, 940 P.2d 1239 (1997); *State v. Elledge*, 144 Wn.2d 62, 66, 26 P.3d 271 (2001)). Second, the *Cross* court recognized that "[t]here was a marked level of cruelty" in the murders: "At least one of Cross's victims was conscious and pleaded with him to either spare her life or kill her more quickly." *Id.* Yates's crimes were similarly cruel. For example, the evidence indicated that, after Yates shot Mercer three times with a .25 caliber weapon and tied four plastic grocery bags over her head, she survived long enough to chew through the two innermost bags and partially suck one bag into her mouth. 56 VRP at 5538-39; 57 VRP at 5626-28. Yates's crimes, in fact, reflected a more calculated cruelty than did Cross's crimes. The degree of planning in Yates's crimes was similar to that seen in the murders committed in *Pirtle*, 127 Wn.2d 628, and *Brett*, 126 Wn.2d 136, and Yates selected his victims from a particularly vulnerable class. *Dodd*, 120 Wn.2d 1.

¶114 The second factor in proportionality review, the aggravating circumstances proved at trial, is closely allied to the first factor, the nature of the crime. Cross's conviction for aggravated first degree murder was based on the "common scheme or plan" aggravator defined in RCW 10.95.020(10), *see* 156 Wn.2d at 633, and as the State points out in the present case, "[p]revious cases have found the death penalty not disproportionate when based on a single aggravator." Br. of Resp't at 226 (citing Luvene Trial Judge Report (TJR) 135; Gentry TJR 119; Benn TJR 75; Harris TJR 29). The jury in the present case, however, found that

the State had proved not only the "common scheme or plan" aggravating factor, but the additional "in furtherance of . . . [r]obbery" aggravator as well. As the *Cross* court pointed out, this court is "not merely looking for the *number* of aggravators but, more importantly, at the *nature* of the aggravating circumstances." 156 Wn.2d at 633 (emphasis added). Here, "the nature of the aggravating circumstances" is disturbing, to say the least. Yates's plan required considerable planning and was carried out, not over a period of hours, but over a span of more than two years. In sum, although Cross's and Yates's death sentences arose from crimes involving a similar number of victims and a similar degree of cruelty, the nature and number of the aggravating factors in the present case mark Yates's crimes as surpassingly reprehensible. Considering the first two proportionality factors (the nature of Yates's crimes and the nature and number of the aggravating factors), we find no basis for declaring Yates's death sentence "disproportionate to the penalty imposed in similar cases." RCW 10.95.130(2)(b).

¶115 To satisfy the requirement in RCW 10.95.130(2)(b) that this court consider not only the crime but also the defendant, the court relies on the third and fourth proportionality factors: the defendant's criminal history (prior convictions) and personal history. Yates has an extensive criminal history. He has been convicted of 13 first degree murders and 1 attempted first degree murder, and those crimes were committed over a period of more than 20 years. As the State pointed out, Yates's prior murder convictions place him in a unique category, since among those defendants included in the trial judge reports, only 13 had a prior conviction for murder or manslaughter, and of those, only 1 had more than one such conviction. Br. of Resp't at 228. As to Yates's personal history, the testimony at his special sentencing proceeding depicted a stable, happy childhood. The State has aptly compared Yates and another defendant who received a death sentence:

> "Stenson was not lacking in normal intelligence, was not youthful, and was not the victim of a tragic background. We

have compared this case and all the circumstances of the Defendant and his crime with other first degree aggravated murders which have and have not received the death penalty. Given the brutal, calculated nature of the crimes, the motivation of financial gain, and the lack of mitigating circumstances, we conclude the sentence was neither excessive nor disproportionate."

*Id.* at 229 (quoting *Stenson*, 132 Wn.2d at 760). As with proportionality factors one and two, the consideration of factors three and four (Yates's criminal and personal history) does not suggest that his death sentence was "excessive or disproportionate to the penalty imposed in similar cases." RCW 10.95.130(2)(b).

b. Related Constitutional Challenges

¶116 Yates raises additional issues related to the proportionality review. First, Yates argues that chapter 10.95 RCW is unconstitutional because it grants county prosecutors too much discretion in determining when to seek the death penalty. This court has repeatedly rejected the argument that prosecutorial discretion violates equal protection. *See Cross*, 156 Wn.2d at 625 (citing *State v. Rupe*, 101 Wn.2d 664, 700, 683 P.2d 571 (1984); *State v. Campbell*, 103 Wn.2d 1, 26, 691 P.2d 929 (1984)). The prosecutorial discretion permitted in RCW 10.95.040 is not contrary to the United States Supreme Court's key decisions regarding the death penalty,[31] and the *Cross* court declined to extend the Court's decision in *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000), beyond the

[31] *See Furman v. Georgia*, 408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring); *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (stating that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant"); *see also Sullivan v. Askew*, 348 So. 2d 312, 319 (Fla. 1977) (England, J., concurring) (summarizing that "[i]n *Gregg* the . . . Court very clearly indicated that its constitutional concern regarding the imposition of death is the judicial process alone, and *not the discretionary stages which precede (prosecutorial discretion)* or succeed (clemency) the judicial processes of trial and appellate review" (emphasis added)).

"narrow realm" of election law. 156 Wn.2d at 626 (citing *Bush*, 531 U.S. at 109). We again reject the argument that RCW 10.95.040 vests too much authority in local prosecutors.

¶117 Second, Yates argues that Washington's death penalty statute is arbitrary and thus violates the Eighth Amendment prohibition against "cruel and unusual punishments." U.S. CONST. amend. VIII. In *Dodd*, this court recognized that "[t]he sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of the sentence." 120 Wn.2d at 13 n.2 (citing *Gregg v. Georgia*, 428 U.S. 153, 188-89, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 304-05, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)). As recognized in *Cross*, this court has "repeatedly held that our statutes meet this standard." 156 Wn.2d at 623. The *Cross* opinion sets forth eight statutory protections that, along with the statutorily mandated proportionality review, "prevent[ ] arbitrary and capricious application of the death penalty." *Id.* at 623-24. Because Yates cannot establish that chapter 10.95 RCW violates the Eighth Amendment, his claim that the statute violates article I, section 14 of the Washington State Constitution is unavailing. *See Dodd*, 120 Wn.2d at 22 (concluding that "[t]he *Gunwall*[32] factors do not demand that we interpret Const. art. 1, § 14 more broadly than the Eighth Amendment"). Similarly, Yates claims that chapter 10.95 RCW violates the International Covenant on Civil and Political Rights (ICCPR), which provides that "[n]o one shall be arbitrarily deprived of his life" or "subjected to torture or to cruel, inhuman or degrading treatment or punishment," but Yates has not explained why the treaty's clauses should

---

[32] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

be read more broadly than the Eighth Amendment. ICCPR arts. 6(1), 7, Mar. 23, 1976, 999 U.N.T.S. 171.

¶118 Third, pointing to his own sentence in Spokane County and to Gary Ridgway's sentence in King County, Yates argues that his death sentence in Pierce County was disproportionate, freakish, wanton, and random. This argument is a more specific version of the two preceding arguments. That Yates was permitted to avoid the death penalty in Spokane County by pleading guilty to 13 counts of first degree murder and 1 count of attempted first degree murder was the product of the Spokane County Prosecuting Attorney's exercise of discretion. Likewise, the King County prosecutor exercised his discretion and allowed Ridgway to avoid a death sentence by pleading guilty to 48 counts of aggravated first degree murder. The effect of the Ridgway plea agreement on this court's proportionality review was an issue squarely before the court in *Cross*. There, the majority rejected the view that one prosecutor's discretionary decision could render chapter 10.95 RCW unconstitutional: "Ridgway's abhorrent killings, standing alone, do not render the death penalty unconstitutional or disproportionate. Our law is not so fragile." *Cross*, 156 Wn.2d at 624.

¶119 Finally, Yates argues that this court cannot meaningfully engage in the proportionality review mandated in RCW 10.95.130(2)(b) because of the incompleteness and inaccuracy of the trial judge reports. *See* RCW 10.95.120. In Yates's view, the defects in the set of reports result in a violation of his due process rights under the Fourteenth Amendment. This argument was punctured in this court's *Cross* opinion. There, describing the trial judge reports database as "now overwhelmingly complete," the court rejected the claim that the state of the database precluded meaningful proportionality review: "There is an ample amount of detail we can use to compare this case with the others collected, and we have no reason to think that the omitted reports would not be consistent with the completed ones." *Cross*, 156 Wn.2d at 638.

¶120 We conclude that Yates's death sentence was not "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). We also reject Yates's related constitutional arguments.

CONCLUSION

¶121 We conclude that Yates has failed to establish reversible error, and thus we affirm his convictions and sentence.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, BRIDGE, and FAIRHURST, JJ., concur.

¶122 CHAMBERS, J. (concurring) — For the most part, I concur with Justice Owens' well reasoned opinion. However, while I agree that Robert Yates' equitable estoppel argument should be rejected, I have considerable reservations about the sweeping scope of the majority's statement that equitable estoppel may *never* be asserted by a criminal defendant against the State. Whatever the federal courts do, we may hold our State to a higher standard.

¶123 Estoppel helps ensure that our courts are courts of justice, not just of law. We should not hesitate to apply estoppel, even against the State, when justice so requires. *See generally Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 20, 43 P.3d 4 (2002) (citing *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 599, 957 P.2d 1241 (1998)). That said, I agree with the majority this far: estoppel should only be available in the rarest of plea bargaining cases. A plea bargain is an agreement between the defendant and the prosecutor. We should generally resist the urge to rewrite these agreements.

¶124 Restraint is appropriate, in part, because of our due respect for the agents of the executive branch, including prosecutors, and our due respect for the legislative branch. Our legislature has broadly vested county prosecu-

tors with the power to prosecute violations of state law. RCW 36.27.005, .020(4) (the prosecuting attorney shall prosecute "all criminal and civil actions in which the state or the county may be a party"). The courts of one county have the power to hear disputes arising in any county, so long as the controversy falls within the court's subject matter jurisdiction. *Dougherty v. Dep't of Labor & Indus.*, 150 Wn.2d 310, 317, 76 P.3d 1183 (2003). Similarly, a prosecutor in one county has the power to charge a defendant and negotiate a plea no matter where in the state the crime was committed. *Cf. State v. Bryant*, 146 Wn.2d 90, 108-09, 42 P.3d 1278 (2002) (Alexander, C.J., concurring) (citing *Whatcom County v. State*, 99 Wn. App. 237, 993 P.2d 273 (2000)). A defendant may bargain away constitutional rights during plea negotiations with the reasonable expectation that the prosecutor, and other prosecutors, will abide by the bargain.[33]

¶125 But from time to time, for whatever reason, a plea agreement may not fully reflect the reasonable expectation of the parties, and it may be unjust not to enforce the defendant's understanding. In such a case, equitable estoppel may provide us with the best vehicle to ensure that justice is done. To apply equitable estoppel against the government, Yates must prove by clear, cogent, and convincing evidence (1) that the State made a statement or act that is inconsistent with Pierce County's pursuit of the death penalty, (2) that he relied upon this, (3) that he would be injured if the State is allowed to persist, (4) that equitable estoppel is necessary to prevent a manifest injustice, and (5) that application will not impair governmental functions. *See Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743-44, 863 P.2d 535 (1993).

¶126 In this case, after a full evidentiary hearing, a visiting judge found that Yates had failed to prove by clear,

[33] I disagree with the majority that enforcing equity will necessarily interfere with Pierce County's sovereignty. *See* majority at 739-40. Pierce County's sovereignty, such as it is, is highly limited and must give way to the greater sovereignty of the State. *See generally 1000 Friends of Wash. v. McFarland*, 159 Wn.2d 165, 167-68, 149 P.3d 616 (2006).

cogent, and convincing evidence that estoppel was appropriate. The judge found that the Pierce County prosecutor clearly communicated that any permission to negotiate the Pierce County charges had been withdrawn before plea negotiations between Yates and the Spokane County prosecutor on the Spokane, Walla Walla, and Skagit charges had concluded. Perhaps most critically, the trial judge found Yates had not established detrimental reliance. Yates has not shown that the trial judge misapplied the law or misunderstood the facts. Accordingly, I concur in result, though I disagree that a blanket rule is appropriate.

¶127 Finally, I respectfully disagree with the view expressed by my learned colleague Justice J.M. Johnson in his concurrence. Article I, section 22 of our state constitution grants *rights* to defendants. Among those rights is the right to be tried in the county where the crime was committed. CONST. art. I, § 22. That is *not* some sort of exclusive, but waivable, grant of jurisdiction to the county where the crime was committed. *Venue* may be appropriate in a different county, and a defendant may insist that the case be transferred. *See generally* CONST. art. I, § 22; CrR 5.2. But, as we have noted before, venue and jurisdiction are distinct matters. *Dougherty*, 150 Wn.2d at 317. Further, article I, our state bill of rights, sets forth the rights of individuals. It makes little sense to me that our founders would have snuck a jurisdictional limitation into our bill of rights. Instead, I would expect to find such a structural detail in either article IV, which concerns the powers of courts, or in article XI, which concerns the organization of municipal governments.

¶128 The proper question is not whether Yates waived his right to be tried in Pierce County. The proper question is whether, in this case, the Pierce County prosecutor was bound to not seek the death penalty by the actions of the Spokane County prosecutor. I concur that Pierce County was not so bound. With those reservations, I join the majority.

¶129 J.M. JOHNSON, J. (concurring) — I concur in the majority's decision to affirm the judgment and sentence of the trial court. Majority at 794. I write separately to express my conclusion that Robert Yates' claim that his plea agreement with Spokane County may affect his Pierce County murder charges is fundamentally flawed under our state constitution. Specifically, Yates' argument must fail because he refused to waive his article I, section 22 right to trial in Pierce County for the murders committed there. This precluded Spokane County from exercising any authority over these Pierce County charges. CONST. art. I, § 22.

¶130 Yates argues that his plea agreement with the Spokane County Prosecuting Attorney, under which that county agreed not to seek the death penalty, must also be effective as to his Pierce County charges for the murders of Melinda Mercer and Connie Ellis. However, Yates' argument is finally rebutted by our state constitutional requirements. Yates' offenses that occurred in Pierce County had to be tried in that county, absent waiver of Yates' constitutional right to proper venue in the county in which the crime occurred. *See* CONST. art. I, § 22; *State v. Carroll*, 55 Wash. 588, 590, 104 P. 814 (1909) (concluding that trial in county other than where offense was committed deprived appellant of his right to proper venue under article I, section 22); *see also State v. Ashe*, 182 Wash. 598, 48 P.2d 213 (1935) (discussing constitutional right to proper venue); *State ex rel. O'Phelan v. Superior Court*, 88 Wash. 669, 153 P. 1078 (1915) (same). Because Yates refused to waive his venue right, it remained constitutionally impermissible for Spokane County to adjudicate Yates' Pierce County charges. Thus, Yates' arguments that Spokane County effectively took action regarding his Pierce County offenses as part of its plea bargain with Yates cannot possibly succeed.

¶131 Article I, section 22 of our state constitution provides, in pertinent part: "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury *of the county in which the offense is*

*charged to have been committed.*" CONST. art. I, § 22 (emphasis added). A defendant may waive this right affirmatively or by failing to assert it prior to the time jeopardy attaches. *State v. McCorkell*, 63 Wn. App. 798, 801, 822 P.2d 795 (1992). Absent waiver, however, a criminal trial may not go forward in a county other than the one in which the alleged offense was committed. *Carroll*, 55 Wash. at 589-91. Likewise, absent waiver, prosecutors of a county other than the one in which the alleged offense occurred may not negotiate and enforce a valid plea agreement. This latter prohibition logically follows because guilty pleas are essentially substitutes for a conviction pursuant to trial. *See Brandon v. Webb*, 23 Wn.2d 155, 160, 160 P.2d 529 (1945) ("Such plea is a confession of guilt and is equivalent to a conviction . . . ."). The correctness of this analysis is further supported by the fact that permitting guilty pleas regardless of proper venue would allow a prosecutor in another county to usurp the recognized authority of the elected prosecutor in the county where the crime was committed to control the enforcement of justice within his county. *See State v. Bryant*, 146 Wn.2d 90, 102, 42 P.3d 1278 (2002) ("The decision whether to prosecute or not, and the decision whether to enter into a plea bargain agreement or not, is generally within the discretion of each county prosecutor. How that discretion is exercised affects the quality of law enforcement and the administration of justice within each county, and thus it is of vital importance to the separate counties to determine, individually, the character and emphasis of prosecutions.").

¶132 Here, Yates was charged with two murders that occurred wholly within Pierce County. Under article I, section 22, trial for these offenses was required to occur in Pierce County absent waiver by defendant. *Carroll*, 55 Wash. at 589-91. Apparently aware of this requirement, Spokane County prosecutors attempted to obtain a waiver from Yates through his counsel. 14 Verbatim Report of Proceedings (VRP) at 673. The proposal was refused by Yates' counsel, on Yates' behalf (and presumably reflecting

Yates' decision at that point in the negotiations). 14 VRP at 674. Hence, it remained constitutionally impermissible for Spokane County prosecutors to either try Yates for his Pierce County offenses or negotiate and enforce a valid plea agreement involving those offenses.

¶133 Due to Yates' own actions in refusing to waive his right to proper venue for Pierce County crimes, the Spokane County Prosecuting Attorney was constitutionally precluded from negotiating a valid plea agreement that included Pierce County charges. Accordingly, Yates' argument that his Pierce County charges were encompassed within his plea agreement with Spokane County must fail, regardless of the validity of his estoppel or fairness arguments. For this reason, I concur.

¶134 SANDERS, J. (dissenting) —

> A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it.

*Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).

¶135 Because I cannot uphold a death sentence resulting from a trial riddled with constitutional error, I dissent.

*The Trial Court's Excusal of Juror 39 for Cause Violated Mr. Yates' Federal and State Constitutional Right to a Fair and Impartial Jury*

¶136 A criminal defendant is guaranteed the right to trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution, as well as under article I, sections 3 and 22 of the Washington Constitution. *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *State v. Rupe*, 108 Wn.2d 734, 748, 743 P.2d 210 (1987). A trial court infringes on this right when it excuses for cause jurors who voice "general objec-

tions to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522. As stated by Justice Harry A. Blackmun, writing for the majority in *Gray v. Mississippi*, "To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It 'stack[s] the deck against the petitioner.' " 481 U.S. 648, 658-59, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987) (alteration in original) (quoting *Witherspoon*, 391 U.S. at 523).

¶137 A juror may be challenged for cause if "the juror's views on capital punishment would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *State v. Hughes*, 106 Wn.2d 176, 181, 721 P.2d 902 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)). Excusing a juror who simply expresses conscientious objections to the death penalty violates the *Witt* test as "[t]he crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, *notwithstanding his views on capital punishment.*" *Dutton v. Brown*, 812 F.2d 593, 595 (10th Cir. 1987) (emphasis added); *see also State v. Gregory*, 158 Wn.2d 759, 814, 147 P.3d 1201 (2006) ("Under the *Witt* test, a juror may express scruples about capital punishment, or even personal opposition to the death penalty, so long as he or she can ultimately defer to the rule of law.").

¶138 Juror 39's excusal was impermissible under *Witt*'s impartiality test as she repeatedly assured the court she would listen to the evidence and follow the court's instructions. In her confidential questionnaire, Juror 39 answered she *did not* "hold beliefs or convictions . . . that would cause [her] to automatically vote ***against*** a death sentence without regard to any evidence that might be presented at the trial." Confidential Juror Questionnaire (Juror 39) at 31. She also answered "No" to the question "Would your attitude about the death sentence prevent you from making an impartial decision about the guilt (phase 1) of a person

charged with aggravated first degree murder?" and "No" to "Is there any reason you could not be fair to the prosecution or defense in a case where the death penalty is a possibility?" *Id.*

¶139 Juror 39 further affirmed her ability and willingness to set aside her personal beliefs and follow the court's instructions during the State's examination, which reads in relevant part:

> Q . . . [C]ould you personally vote to execute the defendant?
>
> A *Yes, I would.*
>
> Q And what would you base that on?
>
> A If all the evidence is there . . . if it goes in that direction, *I would do it, yes.*

34 Verbatim Report of Proceedings (VRP) at 2279 (emphasis added).

¶140 Throughout her examination, Juror 39 never once stated she was unable to follow the court's instructions regarding capital punishment. Instead, her responses evidenced "a fundamental acceptance of [her] duty to make an independent and thorough evaluation of the facts and a willingness to follow [the court's] instructions and oath." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 311, 868 P.2d 835 (1994). As such, the court's excusal for cause of Juror 39 runs counter to our precedent. *See Gray*, 481 U.S. at 653 (juror who expressed confusion but ultimately acknowledged she could consider the death penalty in an appropriate case was impermissibly struck for cause); *Gregory*, 158 Wn.2d at 814 (juror properly excused when she answered " 'probably not' " at least three times when asked if she could vote for the death penalty); *State v. Cross*, 156 Wn.2d 580, 596, 599, 132 P.3d 80 (2006) (juror properly excused due to his statement, " 'I would have a hard time [sentencing a paraplegic to death]. I'm not sure I could be totally unbiased.' " (Alteration in original.) Another juror was properly excused when he "gave every indication he would never seriously consider [the death penalty]."); *State v. Davis*, 141 Wn.2d 798, 859, 10 P.3d 977 (2000) (juror rightly dismissed because "her responses to questions . . . indicated

her religious convictions would not allow her to impose the death penalty, and that, if life without parole were a sentencing option, she would vote for that option"); *State v. Gentry*, 125 Wn.2d 570, 635, 888 P.2d 1105 (1995) (dismissed jurors testified they were not certain they could impose the death penalty and could not assure the trial court they would be able to follow its instructions).

¶141 Both the trial court and the majority improperly cite to Juror 39's *personal* opposition to the death penalty as evidence of her inability to perform her task as a juror. The trial court explained it excused Juror 39 for cause because "even in response to [the court's] question she drew upon her personal beliefs." 34 VRP at 2286. In the same vein, the majority cites to Juror 39's answers regarding her *personal beliefs* about capital punishment as indication of her inability to remain sufficiently impartial. *See* majority at 743 (citing to Juror 39's response that she was " '[o]pposed in every possible circumstance' " (emphasis omitted) (quoting Confidential Juror Questionnaire (Juror 39) at 29) to a question asking for a description of *her view* of capital punishment and citing to Juror 39's response that *her views* on capital punishment were based on " 'a philosophy of [hers], [her] *personal opinion*' " (emphasis added) (alterations in original) (quoting 34 VRP at 2276)). The majority also points out that Juror 39, after affirming her personal opposition to the death penalty and then indicating she could vote to impose the death penalty, "admitted the response was contradictory." Majority at 743.

¶142 Contrary to the majority's implication, separating one's personal beliefs from one's ability to fulfill her duty as a juror is not contradictory, but precisely what the law requires. *See Lockhart v. McCree*, 476 U.S. 162, 176, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) ("It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.").

¶143 Accordingly, the majority's fixation on Juror 39's personal opinions about the death penalty is improper. The appropriate question is not whether a juror harbors personal reservations against capital punishment but whether "a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition *could nonetheless subordinate his personal views* to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon*, 391 U.S. at 514 n.7 (emphasis added). What the trial court describes as Juror 39's "dr[awing] upon her personal beliefs" in response to the court's questions is merely Juror 39 *distinguishing* her personal beliefs from her ability to perform her task as a venireman; in short, Juror 39's answers reflect exactly what the law demands. 34 VRP at 2286.

¶144 Even the United States Supreme Court's most recent opinion regarding death qualification, *Uttecht v. Brown*, 551 U.S. ___, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007), does not support the court's dismissal of Juror 39. The *Uttecht* Court, in a five to four decision, reversed the Ninth Circuit Court of Appeals' holding that Juror Z's excusal was unconstitutional. The Court determined dismissal was justified as "the transcript shows considerable confusion on the part of [Juror Z], amounting to substantial impairment." *Id.* at 2230. It observed Juror Z "had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." *Id.* at 2220. This court below also upheld Juror Z's excusal, opining, "On voir dire [Juror Z] indicated he would impose the death penalty where the defendant 'would reviolate if released,' which is not a correct statement of the law. He also misunderstood the State's burden of proof. . . ." *State v. Brown*, 132 Wn.2d 529, 604, 940 P.2d 546 (2006), *aff'd sub nom. Uttecht*, 551 U.S. ___, 127 S. Ct. 2218. The *Uttecht* Court affirmed Juror Z's excusal notwithstanding the fact the juror stated six times,

over the course of questioning, "that he could consider the death penalty or follow the law." *Uttecht*, 127 S. Ct. at 2227. The Court stated such assurances "do not overcome the reasonable inference from [Juror Z's] other statements that in fact he would be substantially impaired in this case because there was no possibility of release." *Id.* at 2229.

¶145 Unlike Juror Z in *Uttecht*, Juror 39 never misstated or misunderstood the law; instead, she repeatedly assured the court she was able to fulfill her role as a juror, indicating no less than nine times in her examination and questionnaire that she was able to follow the court's instructions and impose a death sentence if necessary. Indeed the *Uttecht* Court stressed *Witt*'s instruction that "reviewing courts are to accord deference to the trial court," stating, "[t]he judgment as to 'whether a veniremen [sic] is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' " *Id.* at 2223 (second alteration in original) (quoting *Witt*, 469 U.S. at 428). And the Court explained, "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " *Id.* (alterations in original) (quoting *Witt*, 469 U.S. at 434).

¶146 But a trial court's ruling that flies in the face of *Witt*'s impartiality standard should be owed no deference. And the fact that the court had exclusive province as to Juror 39's demeanor may not trump that juror's consistent, unambiguous commitment to impartiality or justify her erroneous removal. We must not underestimate the "significance of a capital defendant's right to a fair and impartial jury." *Gray*, 481 U.S. at 658. Because Juror 39's for cause dismissal denied Robert Yates of his constitutional assurance of an impartial jury, his death sentence must be reversed. *See id.* at 668 (Where the trial court excuses a juror who qualifies as impartial under *Witt*, the error is never harmless and the remedy is reversal of the death sentence.).

*The Trial Court's Erroneous Instruction on the "Common Scheme or Plan" Aggravator Lowered the State's Burden of Proof by Eliminating the Requirement That There Be a Nexus between the Murders*

¶147 The trial court lowered the State's burden of proof by improperly defining, in jury instruction 20, the aggravating circumstance of RCW 10.95.020(10)[34]: commission of the murders as "part of a common scheme or plan."

¶148 The court provided the following instruction defining "common scheme or plan":

> A "common scheme or plan" means there is a connection between the crimes in that one crime is done in preparation for the other.
>
> A "common scheme or plan" also occurs when a person devises an overarching criminal plan and uses it to perpetrate separate but very similar crimes.

Clerk's Papers at 4106 (Jury Instruction 20). The above instruction allowed the State to prove the presence of the common scheme or plan aggravator simply by showing Yates devised an overarching criminal plan and used it to perpetrate separate but very similar crimes. In short, the instruction eliminated the requirement this court has consistently demanded under RCW 10.95.020(10)—that there be a nexus between the murders. *See State v. Finch*, 137 Wn.2d 792, 835, 975 P.2d 967 (1999) ("Under [RCW 10.95.020(10)] multiple murders are required and there *must be* a ' "nexus between the killings." ' " (emphasis added) (quoting *State v. Pirtle*, 127 Wn.2d 628, 661, 904 P.2d 245 (1995) (quoting *State v. Dictado*, 102 Wn.2d 277, 285, 687 P.2d 172 (1984)))); *see also Finch*, 137 Wn.2d at

---

[34] RCW 10.95.020 provides in part,

> A person is guilty of aggravated first degree murder . . . if he or she commits first degree murder . . . and one or more of the following aggravating circumstances exist:
>
> . . . .
>
> (10) There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person; . . . .

835 (a sufficient "nexus" exists between killings "when an overarching criminal plan connects both murders").

¶149 As the majority notes, the court's instruction erroneously relies on the two alternative definitions of "common scheme or plan" this court developed in *State v. Lough*, 125 Wn.2d 847, 889 P.2d 487 (1995). The *Lough* court determined,

> There are two different situations wherein the "plan" exception to the general ban on prior bad acts evidence may arise. One is where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan. . . . The other situation arises when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.

*Id.* at 854-55. But what the trial court and the majority fail to recognize is that the alternative definition provided in *Lough* was developed solely with regard to the admission of evidence under ER 404(b), that is, the *Lough* court neither contemplated nor addressed the common scheme aggravator under RCW 10.95.020. Stated differently, "the standard announced in *Lough* merely identifies the parameters of a court's discretion to admit evidence as proof of a common scheme, and not the standard for when evidence will establish beyond a reasonable doubt that such a plan exists for purposes of RCW 10.95.020(10)." Br. of Appellant at 86-87. And, as Yates rightly points out, there is a "significant difference between what the State must proffer to convince a court to exercise its discretion to admit evidence and what the State must prove to obtain a conviction of aggravated first degree murder." *Id.* at 88.

¶150 Not one of our cases has applied *Lough*'s alternative definition of common scheme or plan to RCW 10.95.020. And while the majority claims Yates ignores this court's earlier reliance on *Lough* in *Pirtle*, the *Pirtle* court cited only to the first of *Lough*'s definitions, thereby continuing to require a "nexus" between the killings for proof of the aggravator. *See Pirtle*, 127 Wn.2d at 662 ("[T]he common

scheme or plan aggravator requires the killings be connected by a larger criminal plan."). The *Pirtle* court did not, as the majority suggests, endorse application of *Lough*'s alternative definition of common scheme or plan to RCW 10.95.020.

¶151 Because the trial court's instruction eliminated the requirement that the murders be connected by a common plan, Yates' jury was free to find the presence of the common scheme or plan aggravator based only on the fact that Mr. Yates killed both victims in a similar fashion.

¶152 If just one aggravating factor is dismissed for lack of proof, Yates' death sentence must be reversed. A jury in a special sentencing proceeding must consider the following question: " 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' " RCW 10.95.060(4). "The jury is not instructed to consider the crime and separately consider the aggravating factors. Rather, the aggravators describe the circumstances of the 'crime' for which [the defendant] was found guilty." *State v. Brett*, 126 Wn.2d 136, 169, 892 P.2d 29 (1995), *conviction rev'd, sentence vacated on other grounds sub nom. In re Pers. Restraint of Brett*, 142 Wn.2d 868, 16 P.3d 601 (2001). Thus, because Yates' jury, assessing leniency, considered two aggravating factors,[35] which lack sufficient proof, Yates' sentence must be reversed.

¶153 Because the trial court's dismissal of Juror 39 and the court's erroneous instruction regarding the common plan or scheme aggravator demand reversal of Yates' death sentence, I dissent.

Reconsideration denied December 24, 2007.

---

[35] The majority concluded the evidence was insufficient to support the third alleged aggravating factor—that Yates murdered Melinda Mercer and Connie Ellis " 'to conceal the commission of' the crime of patronizing a prostitute." Majority at 755 (quoting RCW 10.95.020(9)).